## ZAMORA v. UNITED STATES.
### No. 9344.

Circuit Court of Appeals, Ninth Circuit.
June 11, 1940.

Mildred R. Hermann and Frank H. Foster, both of Juneau, Alaska, and Leo Levenson and Irvin Goodman, both of Portland, Or., for appellant.

Wm. A. Holzheimer, U. S., Atty., and George W. Folta, Asst. U. S. Atty., both of Juneau, Alaska, and Valentine Hammack, Asst. U. S. Atty., of San Francisco, Cal., for appellee.

Before GARRECHT, HANEY, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

In the District Court for the Territory of Alaska, First Division, appellant Miguel

Zamora was indicted for having, on or be-fore the 8th day of April, 1938, wilfully, feloniously, and maliciously burned the dwelling house of John Silva. He was tried by a jury, found guilty, and sentenced by the court to a term in prison. From the judgment and sentence appellant has appealed.

Appellant Zamora had been married to Silva's adopted daughter for more than two years prior to the time of the fire. For a time he and his wife had lived with Silva and later by themselves. About three weeks before the fire they separated, and Mrs. Zamora went to live at the home of her father. Appellant frequently came to the house, and often on these occasions quarreled with his wife, which generally caused her mother to have a heart attack. Mrs. Silva did not want him to come to the house any more.

On April 7, 1938, the day preceding the fire, Zamora again came to the house. He first knocked at the front door; no attention being paid to him, he went around to the back of the house, where Silva was fixing his boat.

Silva testified: "I told him he could not come any more, because he had made a lot of trouble when he came to the house, and he said that so long as I kept his wife there, he would never stop coming. When I told him he could not come there any more he said he was going to kill someone in the house. He said he would make my house suffer, and everyone in it. After he crossed the street, he said: 'You are very proud because you got a house. You will never see your house some day.' He said I was not going to have any more house some day, and I would find out what he was going to do to the house some day. And then the house caught on fire that same night—half past one."

William Granier, in corroboration of Silva, testified: "I saw the defendant Zamora on the afternoon preceding the fire at Silva's house. He was in the alley between the house where I live, and the Silva house. He was within eighteen feet of my house, and it was about four o'clock in the afternoon. He was arguing with Silva. When they got under my window I could hear what they were saying. I heard Zamora tell Silva he was mighty proud of his house. Then he said 'Some day you won't have no home, then you won't be so proud'. I did not hear anything about killing, but

he said he would get some one in the house. They were angry."

The fire started about 1:30 a. m., April 8, 1938. It originated in the bathroom, the only entrance to which was through a a small bedroom, which, on the night of the fire, was occupied by Mabel Jackson, Alice Bassford, Mrs. Zamora and her baby. There was a window in this bathroom, about two by three feet, the lower part of which was about four feet from the floor. The window opened inward from the top, back into the room about one and one-half feet. Mrs. Bassford opened this window a day or two before the fire, and it had remained open.

There was no stove or chimney in the bathroom. The only chimney in the house was one made of cement blocks, located in the middle of the partition between the kitchen and the living room. It was so constructed that it would take two pipes, one from the kitchen and one from the living room. The cooking stove in the kitchen was two and one-half feet from the bathroom partition and connected with the chimney by means of a pipe. The heater in the living room was about three feet from the wall and also connected with the chimney by means of a pipe.

Alice Bassford testified that the first warning she had of the fire was the smell of gas; that she wakened Mrs. Zamora and called her attention to this odor. They both got up, went into the kitchen and looked into the stove, but there was no fire there. She returned to the bedroom and then saw flames coming from the bathroom. She woke Mr. Silva up and ran from the house.

In this connection Silva further testified: "After I went to bed, I heard someone calling me. It was Alice, and she said the house was on fire. I got up quick, and put on my shirt and pants and ran out. I put no shoes on. I ran downstairs and looked in both stoves, and there was no fire in them. I thought the fire was in the roof so I ran outside and looked, there was no fire on the roof, so I ran back and asked where the fire was, and Alice told me it was in the bathroom. Then I went to the door and looked and the whole bathroom was on fire. * * * After I saw the fire in the bathroom, I ran back to the sink, and took a water bucket and filled it and threw it on the fire, and it seemed to splash all over like gasoline. And as soon as I

threw the water, I smelled gasoline. The smoke was black, and as soon as I filled the bucket again, and threw it again, and the whole fire came outside in the bedroom and burned all my hair off, and my face. Then I threw the bucket and ran outside for help. My wife was upstairs. After I called for help, I ran upstairs, and found her half way down. She only got half way down. She was choking. I packed her down on my shoulder and into the street. Alice had gone to call the fire department, Helen and Mabel were already out. I was the last one out. I just stood and looked at the fire. My house burned down. It did not take very long until it was all gone. All I had on was my pants and shirt; my wife and Helen had the clothes on they were sleeping in. I did not have any insurance on the house. And I did not owe any money on the house. I paid the mortgage off. After I got out, I told White, one of the firemen, what Zamora had said to me. Afterwards I told the policeman, Clifford Fenn. Afterwards Fenn and White and I went to Zamora's room. The door was locked. He knocked—no answer—then he tried the lock again—then he knocked again, hit the door hard and no answer. Then he broke the lock, and there was Miguel, just like he was sleeping. He had a blanket over his face. I saw him at the fire. He was there when the building next door started to burn, about half an hour before we went to his room."

Mrs. Zamora testified on behalf of appellant. Among other things, she said that after being aroused by Mrs. Bassford she got up and looked in the stove in the kitchen and also in the heater in the living room, that there was no fire in either; that on returning to the bedroom she saw that the fire was in the bathroom. She further testified that the paper behind the stove in the kitchen and back of the heater in the living room was supposed to be fireproof.

Mabel Jackson, a witness for the government, testified that on the night of the fire she was sleeping in the downstairs bedroom, next to the bathroom; that Alice Bassford and Mrs. Zamora were occupying the same room. She was awakened by Alice, who asked her if she smelled gas. She got up and went into the hall; she saw Zamora running along a narrow passageway between the Silva house and the adjoining cabinet shop. On the same morning of the fire she told John Silva that she had seen appellant between the houses.

Clifford Fenn, the night patrolman of the city, testified that the beer parlors of the city close at 1 a. m.; that within a minute of that hour, on the morning of the fire, he looked in at a place known as Charley Mann's Beer Parlor. Those in charge were just closing. Immediately afterward, and within a few feet of the place, he saw appellant; apparently, he was coming from one of the beer parlors. He was going in the direction of Silva's house, which was also in the direction of the place where he roomed. After seeing Zamora the officer finished his round, and went down to the City Float, which was about two and one-half blocks from Silva's house. There was no fire then, he said, because he was looking in that direction. About one half-hour thereafter, on his return trip, he noticed the fire. The flames were shooting into the air.

After the fire was under control, John Silva made a complaint to Uley White, a member of the fire department, who was working to put the fire out. He told Silva to see Fenn, the night patrolman. Thereafter, in the presence of White and the fire chief, Silva complained to Fenn that Zamora had set fire to the building. Fenn, White, and Silva then went to the rooming house where appellant stayed. Fenn "knocked and hammered and kicked and yelled and rattled the door until [he] loosened the hook." The group then entered the room and found Zamora lying on the bed appearing as though asleep. Fenn took him into custody.

Appellant Zamora did not take the witness stand.

■ At the conclusion of all the evidence appellant moved for a directed verdict on the ground that the evidence was insufficient to sustain a verdict of guilty The motion was denied. A further motion to set aside the verdict on the same ground was also made and denied. These rulings are assigned as error. The evidence, as hereinbefore narrated, was sufficient to require submission of the case to the jury. The rulings of the court on these motions were correct.

■ During the progress of the trial appellant moved for a continuance to secure the attendance of a witness, who had been at the place of trial but had departed there-

from. Appellant had not caused said witness to be subpœnaed. The affidavit made and executed by the appellant's attorney in support of this application for continuance shows that no diligence had been exercised to secure the attendance of this absent witness. It appears from the affidavit that the witness departed from the place of trial on a boat, and there is no allegation that the attendance of this witness could be procured at a future time. There is no allegation that the facts to which this witness would testify could not otherwise be procured. The affidavit does not state what facts this witness would testify to, so that the court could determine that the evidence to be offered was competent, relevant, and material. The affidavit sets forth only generalities and conclusions but no definite facts. The most that it states is that defendant's attorney had "questioned her [the witness] in regard to the nature of her testimony and found it to be material to defendant's defense." The showing was not sufficient to warrant a continuance. See 12 Am.Jur. pp. 474, 475, Continuances, §§ 33, 34, 35.

■ Appellant also assigned error because the court denied his offer to prove, by his wife, that a few days prior to the alleged crime of arson there had occurred a roof fire at Silva's house, due to a defective chimney, and in that connection there is further claimed error in the refusal of the court to permit applicant to introduce expert testimony concerning fire hazard and causes generally, particularly in relation to such hazards arising from a defective chimney. There was no offer to show any causal connection between the roof fire, or the condition of the chimney, and this fire originating on the ground floor in the bathroom, in no way connected with the chimney. The court ruled that "until a proper foundation is laid, the testimony you suggest would not be competent." No effort was made to remedy the defects indicated by the court. The ruling of the court was not error.

It is contended that the court erred in denying appellant the right to impeach Mabel Jackson, a government witness.

■ Among other things, in the course of her testimony Mabel Jackson stated that she had seen the appellant running in the narrow passage way between the house and the cabinet shop at the time of the fire. On cross-examination she was asked if

she had testified to this at the preliminary hearing. She said that she had. In sustaining objection to a question asked of appellant's wife, propounded for the purpose, so it is asserted, of impeaching the witness, Jackson, by having the wife testify that said witness had not mentioned the incident in question at the said preliminary hearing, the presiding judge pointed out that a proper foundation for the impeachment of the witness had not been laid. No attempt was made to remedy this defect. There was opportunity to make such a correction, and because of the failure the ruling complained of was made. Section 4257, Compiled Laws of Alaska, 1933, pp. 834, 835, provides: "A witness may also be impeached by evidence that he has made at other times statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of times, places, and persons present; and he shall be asked whether he has made such statements, and if so, allowed to explain them. If the statements be in writing they shall be shown to the witness before any question is put to him concerning them."

■ Aside from any statute, it is the general law that "A sufficient foundation must be laid before the credibility of a witness may be attacked." 70 C.J. § 1002, p. 798; Osborne v. United States, 9 Cir., 17 F.2d 246, 250.

■ Another assignment of error is based on the failure of the court to grant a separate application for a new trial, filed more than three months after the verdict was entered. This application was made upon affidavit of the owner of the poolroom where appellant had been playing cards between 10 p. m. and a few minutes after 1 a. m. of the day of the fire and the affidavit of a taxicab driver, who was taking part in the card game. There is nothing in these affidavits at variance with the testimony of the night patrolman, and nothing inconsistent with the testimony of the prosecution, other than that in the affidavit of the taxicab driver he sets forth certain conclusions which cause him to believe that appellant was innocent, based upon his assumption that since appellant was proceeding on foot while he traveled in his cab, the defendant would not have been able to cause the fire, which, he said, he discovered at the Silva house when he reached there.

These men were the last persons with whom Zamora had contact prior to the fire. Naturally they would have been the first persons thought of to establish this alleged alibi. No reason is given why they were not produced at the trial, other than, as stated in their respective affidavits, that both these witnesses "confidently expected the case to be thrown out of court." In denying the motion the court did not abuse its discretion.

Judgment affirmed.