**Patrick Michael AMES, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 2145.**

Supreme Court of Alaska.

April 3, 1975.

---

Herbert D. Soll, Public Defender, Anchorage, Stephen R. Cline, Asst. Public Defender, Fairbanks, for appellant.

Norman C. Gorsuch, Atty. Gen., Juneau, Catherine A. Chandler, Dist. Atty., Robert B. Downes, Asst. Dist. Atty., Fairbanks, for appellee.

## OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

FITZGERALD, Justice.

Patrick Michael Ames was convicted of rape [1] and sentenced to a term of eight years' imprisonment. Ames now appeals from the conviction and sentence.

In his appeal from the conviction, Ames contends that the trial court committed error in several evidentiary rulings during cross-examination of the victim, Donna Lee Knight, on 18 year-old girl. Miss Knight testified that on August 7, 1973, she shared an apartment with a young woman named Toni Duncan. On the night of the 7th Miss Knight's 14 year-old brother and several other children of approximately the same age were staying in the dining room of the apartment. Miss Knight retired for bed between 11 and 12 p. m. She was awakened by Ames who

1. AS 11.15.120.

entered her bedroom through a window. Until that moment, she was not acquainted with Ames nor to her knowledge had she ever seen him before. Miss Knight, shocked and frightened, asked Ames who he was and ordered him to leave. Ames quickly looked into the other rooms of the apartment, came back into the bedroom, and closed the door. He approached Miss Knight with an open knife, placed it against her neck, and ordered her to "shut up." He undressed and got into the bed.

As Ames started to have intercourse with Miss Knight, she heard someone pass the bedroom, going into the adjacent bathroom. Miss Knight started to scream and Ames put his hand over her face and nose, telling her that if she screamed she would be stabbed. Ames got up, opened the door and looked out into the other rooms of the apartment. He again closed the door and returned to the bed. As he laid down his knife, Miss Knight seized it. A brief struggle followed. Ames overpowered her, regained the knife, and had intercourse with Miss Knight. Ames then left through the window, and Miss Knight ran screaming and crying to the door of a neighbor who called the police.

At the preliminary hearing following Ames' arrest, Miss Knight was cross-examined by Mr. Cline, who later represented the appellant at trial. During the hearing Mr. Cline asked how sound carried in the apartment house:

Q How much later did it come, that you heard somebody walking?

A I don't know. Three or four minutes.

Q Did you—when you say you heard somebody walking, what did you exactly hear? Footsteps, feet, creaking boards, or what?

A The floor is very, very hard and you can hear anybody. You know, even bare feet, you can hear them walking.

.   .   .   .   .   .

Q When somebody goes to the bathroom in that bathroom, can you hear that?

A Yes, I can.

Q You can. If somebody is in the bathroom talking could you have heard him, do you think?

A Yes, I could. The walls are very thin in the whole house. You can even hear the next-door neighbors sometimes when they've got their radio loud.

Q So voices carry from one room to the other pretty well?

A Uh-huh.

In his cross-examination at trial Mr. Cline again questioned Miss Knight about how well sounds travelled in the apartment house:

Q Well, how well can people hear other people in the house?

A Not very well.

Q Would you say the walls are thin?

A In some places they are thin.

Q Would you say the walls are thin in all places?

THE COURT: Do you know how thick the walls are any place in the house?

A No, I'm not sure how thick they are.

Q Would you say the walls are thin in the whole place?

A In the hall—in the hall?

Q In the whole place?

A No, I wouldn't say that.

Q Can you hear the neighbors' radio when they turn it up loud and you're inside your house?

A If—she has those teenagers in her house, and she turns it up—they turn it up pretty loud.

Q Would you say that voices carry from one room to the other pretty well?

A No, I would not say that.

Q Would you say that if somebody was walking on the floor, that you would be able to hear that very easily?

A If it was at night and quiet.

Q Do the boards in the floors squeak when somebody walks?

A No.

. . . . . .

MR. CLINE: Your Honor, I'd like permission to read that . . . .

At that point the court refused to permit Mr. Cline to read the transcript of the preliminary hearing and Mr. Cline resumed his questioning:

Q Donna, would you say that if somebody walks outside your bedroom, that you could even hear them if they were in their bare feet?

A If they're pretty heavy, I mean— 'cause sometimes my brother will walk around in bare feet and you can't hear him.

. . . . . .

Q Donna, have you ever described at any time to anybody the fact that somebody walking in the house with bare feet could be heard?

A I can't recall it, no.

. . . . . .

Q Did you hear somebody actually go in the bathroom?

A Yes.

Q How long were they in the bathroom?

A Only a few seconds.

Q If somebody was in the bathroom talking, could you have heard them?

Mr. Cline now contends he was precluded from proper continuation of impeachment through cross-examination on prior inconsistent statements. We find no error in the ruling by the trial court.[2]

The Alaska rule [3] provides that a witness may be impeached by prior inconsistent statements provided the statements are shown to the witness before any questions are asked concerning them.[4] Mr. Cline failed to follow this procedure. Instead he attempted to read the transcript of the preliminary hearing to the jury. This would have circumvented the rule. Mr. Cline also argues that he was prevented by the trial court from laying the proper foundation for impeachment. This assertion is not supported by the record. The trial judge did not prevent the laying of a proper foundation but only precluded the use of questions which were improper in form or which called for speculative or misleading answers.[5]

Error is also assigned on the grounds that a diagram of the apartment drawn by Miss Knight at the preliminary hearing was excluded at trial. A diagram drawn by Ames was introduced into evidence at the preliminary hearing. According to Mr. Cline, Ames' diagram would have had more credibility at trial if the diagram drawn by Miss Knight had been

2. We express no opinion as to whether the impeachment went to a collateral matter and thus would not be proper. *See* C. McCormick, Law of Evidence § 47, at 98 (2d ed. 1972).

3. Civil Rule 43(g)(11)[c] provides:
    Prior Inconsistent Statements. A witness may be impeached by evidence that he has made at other times statements inconsistent with his present testimony. The statements must first be related to him, with the circumstances of times, places, and persons present, and the witness shall be asked whether he has made such statements and, if so, shall be allowed to explain them. If the statements are in writing, they shall be shown to the witness before he is asked any question concerning them.

Criminal Rule 26(a) provides that in criminal cases the admissibility of evidence is governed by Civil Rule 43.

4. *See* McMaster v. State, 512 P.2d 879, 884–86 (Alaska 1973) (dissenting opinion, Connor, J.); C. McCormick, Law of Evidence § 37, at 72 (2d ed. 1972).

5. Zamora v. United States, 9 Alaska 680, 687–88, 112 F.2d 631 (1940); State v. Bell, 514 P.2d 62 (Ct.App.Or.1973). Since inconsistent statements may be used as substantive evidence, the trial judge should be vigilant to prevent the introduction of improper evidence. Beavers v. State, 492 P.2d 88, 94 (Alaska 1971).

admitted. The trial judge excluded Miss Knight's diagram as possibly misleading because it was a free-hand drawing and a more reliable and accurate diagram could have been provided.

■ The admissibility of exhibits at trial is within the sound discretion of the trial judge.[6] We find no error in the ruling of the trial court.

Mr. Cline next claims that the trial judge demonstrated a prejudicial and restrictive attitude throughout the trial which limited his ability to present defendant's case and prejudiced the jurors against the defendant. Typical of the support of this claim is an exchange which occurred during an argument concerning the admissibility of the diagram drawn by Miss Knight:

THE COURT: Well, I have usually required that drawing—if counsel could anticipate the need for drawings, that they be made to something even approaching scale—the usual drawing that is scribbled out in court—in this court—and as well as down there, are almost impossible to decipher, oftentimes they are just lines on the blackboard, or somebody puts up a yellow piece of paper, so I—I have for a number of years, required counsel, if at all possible, to—if you're going to represent what the apartment looked like, then it should be drawn in a calculating and knowledgeable manner and—so if you—you're entitled to show the inside of this apartment if you so desire, I would certainly prefer that we have some kind of a drawing that's made—maybe not specifically to scale—

but, made with some degree of care by somebody who can draw, so that impressions—false impressions are not gained. And I have seen so many instances where drawings made in court are that way that I hesitate to have them used here.

MR. CLINE: Well, Your Honor, can I have a hearing on this matter, outside of the jury?

■ According to Mr. Cline, he was so overwhelmed by this comment of the court that he felt compelled to register his objection to the trial judge in chambers concerning the prejudice and embarrassment which he suffered in front of the jury. We have, as counsel suggested, examined the record as a whole. We find no merit in the claim that he was so embarrassed by the trial judge that it reflected adversely upon his client.[7]

■ Ames challenges the eight-year sentence imposed by the trial court as excessive. We have on numerous occasions stated the requirements for sentencing by the trial court. *See* State v. Chaney, 477 P.2d 441 (Alaska 1970). The record in this case indicates that the trial judge properly considered the required factors for determining sentence. Defendant's assertion that the sentence is excessive because it does not conform to a "statistical average" in other rape cases is without merit.[8] As we stated in Nicholas v. State, each sentence must be decided on the facts of the individual case and appellate review is not intended to enforce uniformity.[9]

Conviction and sentence are affirmed.

6. State v. Abbott, 498 P.2d 712, 728 (Alaska 1972) ; People v. Hampton, 105 Ill.App. 228, 245 N.E.2d 47, 48 (1969) ; 3 Wigmore on Evidence § 792, at 238–39 (Chadbourn rev. 1970).

7. *See* Pederson v. State, 420 P.2d 327, 337–38 (Alaska 1966) ; People v. Sakelaris, 154 Cal. App.2d 244, 315 P.2d 902, 904 (1957).

8. This court has previously expressed the view that violent crimes involving physical injury to innocent people are to be regarded as our most serious offenses and are not to be

treated lightly. *See* State v. Chaney, 477 P.2d 441, 446 (Alaska 1970) ; State v. Armantrout, 483 P.2d 696 (Alaska 1971), where this court condemned as too lenient sentences for rape and for assault with a dangerous weapon, respectively.

9. 477 P.2d 447, 448–49 (Alaska 1970). The record indicates that appellant has a history of prior convictions including minor on premises, carrying a concealed weapon, and possession of depressant, hallucinogenic or stimulant drugs.