**Julie BABCOCK, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 7577.**

Court of Appeals of Alaska.

June 22, 1984.

Kevin F. McCoy, Asst. Public Defender, Kenai, and Dana Fabe, Public Defender, Anchorage, for appellant.

Peter A. Michalski, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Julie Babcock was convicted of four counts of selling cocaine, in violation of AS 17.10.010 and AS 17.10.200(a). She appeals, contending that the trial court erred

in disqualifying her stepfather, Ray Chandler, from testifying because he had violated a witness exclusion order. *See* A.R.E. 615. We agree that Chandler should have been permitted to testify, but conclude that any error was harmless. We therefore affirm Babcock's conviction.

## FACTS

At trial the primary witness against Babcock was Michael Bunch, a special undercover police officer, who testified that he purchased cocaine from Babcock on four separate occasions in March of 1982. Bunch testified that he made the acquaintance of Robbie Hilderbrandt and asked her to help him find some cocaine. On the evening of March 4, Miss Hilderbrandt met Bunch at the Rainbow Bar in Kenai and introduced him to a woman identified as "Julie". Bunch positively identified Babcock as "Julie" in court, and testified that on March 4 he purchased one-half gram of cocaine from her for $62.

On the evening of March 9, Hilderbrandt took Bunch to another bar where he met Babcock and gave her $120 for cocaine. He testified that Babcock crossed the room and obtained the cocaine from her mother, Janet Chandler. Chandler was Babcock's co-defendant at trial. Bunch testified that on this occasion he and Babcock talked about eliminating Hilderbrandt as a middle person. Babcock agreed to deal directly with Bunch and gave him a piece of paper containing the names Janet Chandler and Julie Babcock and a telephone number. Bunch testified that he told Babcock, "Your backsliding, lady, you never put your name down above your phone number." Babcock then tore the paper into two pieces and gave Bunch the piece with the telephone number on it. Bunch testified that he turned the piece of paper over to Kenai Police Sergeant Roger Dorcas, who was his control officer. Dorcas testified that he checked the telephone number in the local telephone directory and found that it was registered to R.D. Chandler, Janet Chandler's husband and Babcock's stepfather.

On March 12, Bunch made another purchase from Babcock. Again, Babcock obtained the cocaine from Chandler, who was sitting nearby, and gave Chandler the $355 that she received from Bunch.

On March 17, Bunch made a final purchase from Babcock for $130. During this transaction, Bunch was wired with an electronic monitoring device. Sergeant Dorcas monitored the transaction and, although there were problems with the receiver, he testified that he had heard Babcock's voice on prior occasions and recognized it on the tape. The tape was played to the jury.

Neither Chandler nor Babcock testified in her own defense. The defense did not call any alibi witnesses or attempt to show that Babcock and Chandler were elsewhere at the time the drug transactions took place. The efforts of defense counsel were almost exclusively directed toward impeaching Officer Bunch's testimony, particularly his identification of Babcock as the person with whom he had dealt. During cross-examination, Bunch acknowledged that he had given a debriefing interview immediately following the March 4 transaction, and described the woman he had dealt with as having a birthmark or wart on the middle of her chest. At defense counsel's request, Bunch read from a transcript of his interview statement:

> I went over to play darts. At that time a girl named Julie, stood approximately 5'6", 5'7", with brown short hair, not quite shoulder length, wearing a blue halter-type top with white lace type things around—around it. And with ties that go up over the—her shoulders. And right to the center of her chest is where the [ties] came down and meet and it looks like she has a birthmark of some type or something similar. And she walked up to me and said that, I hear you're looking for something.

Upon questioning from defense counsel, Bunch confirmed that he had originally reported that the woman from whom he had purchased cocaine on March 4 had a birthmark or wart on her chest. The defense

exhibited Babcock to the jury to demonstrate that she had no birthmark or mole.

Defense counsel then indicated that he intended to call Margaret Campbell as a witness. The state objected, indicating that Campbell had been present in the courtroom during the testimony of Officer Kallus. This was in violation of the court's order excluding witnesses from the courtroom, which had been requested by Babcock's counsel. *See* A.R.E. 615. Babcock's counsel said:

> ·Indeed that's correct, I was—I neglected to advise [Ms. Campbell] that she was not supposed to be in here. Her testimony will have nothing to do with anything that Officer Kallus has to say. Her testimony will be devoted to whether or not Mr. Bunch smoked marijuana with her or not. I asked her how long she had been in the courtroom. She indicated to me that she had been in less than five minutes. Had I been aware of it, I would have excluded her immediately.

Judge Cranston overruled the state's objection and permitted Campbell to testify as long as she did not testify to anything involving Officer Kallus's testimony.

The defense subsequently called Bonnie Graveley, defense counsel's secretary, who testified that she had carefully examined Babcock's chest that morning and discovered no birthmarks or warts. Graveley identified a photograph of Babcock's chest taken that morning, which was admitted into evidence and shown to the jury. However, on cross-examination, the state established that Graveley had never examined Babcock's chest before that morning.

Next, counsel for Babcock attempted to call Ray Chandler, Babcock's stepfather. However, after a bench conference, the defense rested its case. Apparently, the prosecutor objected to any testimony by Chandler based on Evidence Rule 615, and the trial court sustained the objection. Thereafter, outside the presence of the jury, the trial court indicated that Chandler had been sitting in the courtroom during all of the relevant testimony regarding the existence of birthmarks or other identification marks on Babcock's chest, including extensive argument held out of the jury's presence. Based on that fact and the fact that Babcock's counsel had invoked the exclusionary rule at the commencement of trial, Judge Cranston disqualified the witness. Babcock's counsel stated for the record that he did not know who Mr. Chandler was until Babcock told him that her father was present. Counsel indicated that if he had known Chandler was there he would have excluded him from the courtroom.

As an offer of proof, Ray Chandler testified that he had been married to Janet Chandler for sixteen years and had lived in the same household with Babcock during that period. He stated that· Babcock was three years old when he married her mother, and that he had bathed her on occasion. He testified that she had no birthmarks or warts on her chest. Ray Chandler acknowledged that Babcock had moved out of the house a year and one-half before. He testified, however, that since then he had observed her in low-cut dresses on a number of occasions and did not see any warts or birthmarks on her chest. He conceded that he had not observed Babcock's chest on March 3, 1984.

## DISCUSSION

Alaska Rule of Evidence 615 provides, in relevant part:

> At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order on its own motion....

The commentary to Rule 615, provides, in part:

> Federal Rule 615 makes exclusion upon request by a party a matter of right. Following the prevailing view, that expressed in AS 09.20.180, this rule permits the trial judge discretion in granting requests. The practical difference between the rules should be minimal, since there is rarely a good reason to deny a sequestration request; the procedure is simple and the possible benefit

to be derived by a party is enormous. Inconsistent testimony as a result of sequestering witnesses gives rise to two possible inferences: (1) that an honest mistake was made, suggesting inaccuracy to the factfinder, or, (2) that collusion or perjury has taken place. Both of these inferences may greatly influence the trial. Although it is often difficult to assess the likelihood that sequestration will elicit inconsistent testimony that could not be elicited from witnesses who heard each other testify, the possibility exists in virtually every case. The most honest witness may shade testimony, perhaps only subconsciously, to make it fit the pattern established by other witnesses. Only in exceptional circumstances are there sufficient reasons for denying exclusion.

E.R.C. 193. The rule and commentary are silent as to the consequences of noncompliance with an order of sequestration.

In *Schroff v. State*, 627 P.2d 653, 655–56 (Alaska App.1981), this court stated that "the trial judge has considerable discretion in Alaska to enforce the exclusion of witnesses rule and [may] be reversed only for an abuse of discretion." Babcock urges, however, that a trial court's discretion is limited by a defendant's constitutional right to compulsory process. *See* U.S. Const. amend. VI; Alaska Const. art. 1, § 11. *See also Washington v. Texas*, 388 U.S. 14, 18, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1022–23 (1967) (sixth amendment right to compulsory attendance of witnesses is applicable to the states through the fourteenth amendment). In *Schroff*, the issue was whether the trial judge abused his discretion in admitting testimony of a police officer who had been present in the courtroom during the earlier testimony of another officer. This court concluded that a cautionary instruction was sufficient to cure any prejudice from the violation of the rule. Babcock argues that her case is distinguishable from *Schroff* because, rather than admitting testimony of a state's witness, the court precluded testimony of a defense witness. *See Robinson v. Tennessee*, 340 F.Supp. 82, 85 (E.D.Tenn.1972),

*aff'd*, 474 F.2d 1273 (6th Cir.1973), *cert. denied sub nom.*, 414 U.S. 848, 94 S.Ct. 137, 38 L.Ed.2d 96 (1973) (while no constitutional issue is presented by admission of testimony given by a witness who remained in the courtroom in violation of the rule, exclusion of such a witness's testimony could raise a constitutional issue).

Relying on *Holder v. United States*, 150 U.S. 91, 14 S.Ct. 10, 37 L.Ed. 1010 (1893), the federal courts have generally held that a defense witness may not be disqualified for disobeying a sequestration order unless the witness was present with the consent, connivance, or knowledge of the defendant or his attorney. *See, e.g., Braswell v. Wainwright*, 463 F.2d 1148, 1152–53 (5th Cir.1972); *United States v. Schaefer*, 299 F.2d 625, 631 (7th Cir.1962), *cert. denied*, 370 U.S. 917, 82 S.Ct. 1553, 8 L.Ed.2d 497 (1962).

A number of state court decisions also hold that disqualification of a defense witness is not an appropriate remedy for an inadvertent violation of a witness exclusion order. For example, in *State v. Leong*, 51 Hawaii 581, 465 P.2d 560 (1970), the trial court refused to allow a defense witness to testify who had violated an exclusion order. In reversing Leong's conviction, the court said:

> We agree with the California court that the proper recourse against a witness who violates an order excluding witnesses should be by contempt proceeding for such conduct. Also, that such conduct of a witness affects his credibility, but it should not be used to disqualify him as a witness for a defendant in a criminal case because as we stated above an accused has the constitutional right to have witnesses testify in his favor.

465 P.2d at 563, *citing People v. Duane*, 21 Cal.2d 71, 130 P.2d 123 (1942). *See also State v. Carney*, 216 Kan. 704, 533 P.2d 1268, 1272 (1975); *State v. Boutte*, 384 So.2d 773, 777–78 (La.1980). *Cf. Blanchard v. State*, 247 Ga. 415, 276 S.E.2d 593, 595 (1981) (in a criminal case, violation of the rule of sequestration by any witness,

goes to credibility rather than admissibility). *Contra Rowan v. State*, 431 N.E.2d 805, 817 (Ind.1982) (refusal to permit defense witness to testify because of violation of separation of witnesses order was not abuse of discretion); *Pierce v. State*, 34 Md.App. 654, 369 A.2d 140, 146 (1977), *cert. denied*, 434 U.S. 907, 98 S.Ct. 307, 54 L.Ed.2d 194 (1977) (witness who offered to corroborate defendant's testimony after violating sequestration order was properly excluded from testifying).

In discussing appropriate sanctions for violation of a sequestration order, Wigmore says:

> If the order of exclusion is knowingly disobeyed, the court unquestionably has the power to refuse to admit the disobedient person to testify; and it ought to exercise this power, in its discretion, whenever there appears any reason that the proposed testimony was important, that the witness had heard the other testimony, and that he wished to know its tenor. It may be assumed that the power should not be exercised unless the witness, as above said, was aware of the order of exclusion, for the burden of causing every witness to be notified, and thus preventing inadvertent violation, may fairly be placed upon the party demanding the sequestration. But granting this much, it follows that the most appropriate and only effective means of enforcing an order of court and of securing the right of sequestration is to have it clearly understood that *disqualification as a witness may follow disobedience....*

6 J. Wigmore, *Evidence* § 1842, at 477–78 (Chadbourn rev. ed. 1976) (footnote omitted; emphasis in original). Wigmore concedes that the matter should be left to the sound discretion of the trial court and that disqualification should not occur where the disobedience was inadvertent. However, he cautions:

> But there are several answers to [the argument that a witness should be permitted to testify despite violation of a sequestration order]. In the first place, the fact that the opposing party would be deprived of valuable testimony is in itself no wrong, provided he himself has by connivance invited it. In the next place, it is usually difficult to prove this connivance, and to require it proved might entirely nullify the rule. Again, if the witness is in fact open to the charge of fraudulent evasion, he is an unsafe and untrustworthy witness; a party has no absolute right to the testimony of a trickster, and he cannot complain, even though himself innocent, at the loss of tainted testimony; the argument of some of the judges above quoted assumes erroneously that the party could certainly prove something in his favor by a witness whose conduct has already suggested the strong probability that he will falsify. Furthermore, of two innocent parties, the contingency of suffering should clearly be for him whose witness has been in fault; and this is particularly so where it was also that party's duty, at whatever inconvenience, to secure the obedience of his own witnesses to a plain and simple order of court.

*Id.* at 478–79.

Wigmore strongly implies that trial counsel's failure to discuss the sequestration order with his witnesses and to caution them to remain outside the courtroom during the testimony of others constitutes connivance. Under Wigmore's analysis, it is arguable that Chandler's testimony was properly excluded. Babcock's counsel initially invoked the sequestration rule. He was alerted to problems when Campbell inadvertently came into the courtroom and the prosecutor objected to her testimony in reliance on Rule 615. A strong argument could be made that Babcock and her counsel should have been alerted by this transaction to take steps to ensure that their subsequent witnesses would not come into the courtroom. While it is possible that Mr. Chandler was not a planned witness at that time, and that the defense first decided to call him in response to the state's impeachment of Graveley's testimony, this is not clear from the record. Counsel did not argue that Mr. Chandler had already

heard Graveley's testimony before the decision was made to use him as a witness.

Although under the facts of this case it may have been within the trial court's discretion to exclude Chandler as a witness for violating the sequestration order, exclusion was not the only sanction available. In *Cano v. Anchorage,* 627 P.2d 660, 663 (Alaska App.1981), we said:

In the exercise of sound legal discretion, a court must consider the alternatives available to it and choose among them. When the trial court fails to recognize the alternatives from which it may choose, it cannot be said that discretion was in fact exercised. When it is clear from the record that the trial court not only erred as to the scope of its power, but also failed to give defendant's motion the consideration required by law, the court is in error, since a defendant is "at least entitled to the court's consideration of his motion under a correct view of the law." Such an error will result in reversal with directions to the trial court to reconsider the motion and to enter an appropriate judgment or order. [Citations omitted; footnote omitted.]

Judge Cranston overruled the state's objection to Campbell's testimony based on Rule 615. He clearly understood that he had discretion to permit a witness to testify, despite violation of the sequestration order, when the witness had not heard any testimony relevant to her own testimony. It is not clear, however, whether he recognized that he had discretion to permit a witness who had violated the rule to testify, even though the witness had heard relevant testimony. The record does not indicate that Judge Cranston considered other sanctions such as imposition of a fine or a cautionary instruction. This failure is particularly troublesome because as we said in an analogous situation in *State v. Lewis,* 632 P.2d 547, 550 (Alaska App.1981), "the remedy [for discovery violations] of exclusion of significant evidence should be used by the trial court only in rare situations." [Footnote omitted.]

In exercising discretion, the trial court should consider both the costs and benefits associated with disqualifying the witness. One of the costs is the loss to the defendant of the testimony; evaluating this loss requires consideration of the strength of the evidence, the importance of the issue upon which it is offered, and the extent to which it is cumulative of other evidence. The benefits include avoiding the risk that the party proffering the witness either intentionally or negligently violated the rule or that the witness's testimony was tainted by exposure to other testimony. In requiring this balancing we do not overlook Wigmore's suggestion that demanding substantial evidence of connivance or tainted testimony would in effect abolish the rule. We do believe, however, that the trial court must at least consider these issues in reaching its conclusion. Since there is no indication that the trial court considered alternative sanctions or balanced the prejudice to the defendant from excluding the testimony against the prejudice to the state from allowing it, we conclude that its order disqualifying the witness was error. *See Cano v. Anchorage,* 627 P.2d at 663.

An error in excluding evidence does not, however, require reversal unless it affected a "substantial right." A.R.E. 103(a). An error affecting a substantial right is the converse of a "harmless error." E.R.C. 17–18. When a trial court disqualifies a witness who has violated a sequestration order, but the excluded testimony is cumulative or immaterial, some courts hold that the disqualification was not an abuse of discretion; others hold that it was harmless error. The two concepts are closely related. *Compare United States v. Avila-Macias,* 577 F.2d 1384, 1389 (9th Cir.1978) (no abuse of discretion when excluded testimony was of limited relevance and cumulative), *with Jordan v. State,* 247 Ga. 328, 276 S.E.2d 224, 240 (1981) (exclusion of defense witness's testimony was error but error was harmless beyond a reasonable doubt).

Under either approach, the exclusion of Ray Chandler's testimony clearly does not

warrant a reversal in this case. In *Braswell v. Wainwright*, 463 F.2d 1148, where the defendant's conviction was reversed, the trial court had excluded the testimony of a "vital" defense witness. The court emphasized that the excluded evidence was crucial to Braswell's claim of self defense. "His sole corroborative witness was excluded not because of anything Braswell or his counsel did but because of the apparently innocent actions of the witness." 463 F.2d at 1156.

In arguing that Ray Chandler's testimony was vital, Babcock argues that Bunch was the sole witness connecting her with the four cocaine transactions. These transactions took place in March but the grand jury did not return an indictment resulting in her arrest until July. While Bunch purchased cocaine with marked money, the marked money was never recovered. Robbie Hilderbrandt, who allegedly introduced Bunch to Babcock, did not testify. We have considered Babcock's arguments but we are nevertheless satisfied that the error is harmless.[1]

Chandler's testimony was offered to impeach Officer Bunch's testimony identifying Babcock as the person from whom he bought cocaine on March 4, 1982. It was offered to contradict Bunch's testimony that he had noticed a birthmark "or something similar" on the suspect's chest. However, the testimony of Graveley, that Babcock had no warts or birthmarks, sufficiently raised this identification issue for the jury. The trial court permitted defense counsel to exhibit Babcock to the jury without calling her as a witness and subjecting

---

1. Chandler's testimony, offered to contradict Bunch's identification testimony, may well have involved a "collateral matter" and thus its admission might have been improper. *See Ames v. State*, 533 P.2d 246, 249 n. 2 (Alaska 1975), *modified on reh'g.*, 537 P.2d 1116 (Alaska 1975). McCormick suggests the following test for determining whether impeachment by contradiction through extrinsic evidence is improperly directed towards disproving collateral facts: "The classical approach is that facts which would have been independently provable regardless of the contradiction are not 'collateral.'" E. Cleary, McCormick on Evidence, § 47, at 98 (2d ed. 1972) (footnote omitted). The presence or absence of a birthmark or wart on Babcock's chest would not have been independently admissible in evidence either on the elements of the offense or Bunch's credibility. McCormick cautions that there is also a third kind of fact which must be considered:

Suppose a witness has told a story of a transaction crucial to the controversy. To prove him wrong in some trivial detail of time, place or circumstance is "collateral." But to prove untrue some fact recited by the witness that if he were really there and saw what he claims to have seen, he could not have been mistaken about, is a convincing kind of impeachment that the courts must make place for, although the contradiction evidence is otherwise inadmissible because it is collateral under the tests mentioned above. To disprove such a fact is to pull out the linchpin of the story. So we may recognize this third type of allowable contradiction, namely, the contradiction of any part of the witness's account of the background and circumstances of a material transaction, which as a matter

of human experience he would not have been mistaken about if his story were true. *Id.* at 99 (footnote omitted). *See also* 3A J. Wigmore, Evidence, § 1005(f), at 971, 72 (Chadborn rev. ed. 1970). It is not clear that the presence or absence of a birthmark on Babcock's chest meets this test.

However, a leading treatise writer has suggested that the absolute prohibition on introducing extrinsic evidence regarding a collateral matter to contradict a witness has not survived the enactment of the federal rules of evidence, and that in light of the rules, the fact that impeachment goes to a collateral fact is merely one circumstance that the trial court in its discretion should consider in applying Evidence Rule 403. *See* 3 J. Weinstein and M. Berger, Evidence, ¶ 607[05] (1982). The commentary for the Alaska Rules of Evidence is in accord:

Nothing in [A.R.E. 607(a)] or any other rule specifically bars impeachment by presenting extrinsic evidence on a collateral issue. The word "collateral" has so many meanings that it tends to be confusing. Rule 403, in providing that evidence may be excluded if the time required for its presentation is not warranted by its probative value, will permit exclusion of impeachment evidence that sheds little, if any, light on the credibility of a particular witness in a particular case.

E.R.C. 165–66.

Since Judge Cranston did not specifically reject Chandler's testimony on the ground that it went to a collateral issue, we express no opinion as to whether the evidence was in fact collateral. We do believe, however, that many of the factors which lead a court to brand certain evidence "collateral" are also relevant in determining whether its exclusion was prejudicial error affecting substantial rights.

her to cross examination. Babcock was also permitted to introduce a photograph of her chest showing the absence of any identifying mark. Although the state partially discredited Graveley's testimony by eliciting the fact that she was not familiar with the complexion of Babcock's chest on March 4, there is nothing in the record to indicate that Ray Chandler could have testified to the appearance of Babcock's chest on that particular date either. Babcock's evidence established that she had no permanent mark on her chest. Chandler's testimony would have been only marginally relevant to show that she had no temporary blemish on March 4.

The evidence also suggests that Babcock was well known in the Kenai area. It is likely that a number of people would have been able to give the same testimony that Chandler was prepared to give, yet Babcock did not ask for a continuance in order to obtain such testimony. There is no indication in the record that Judge Cranston would have foreclosed other testimony on this issue or denied a continuance to obtain it.

In addition, there was substantial ambiguity in the testimony concerning the blemish that Officer Bunch had observed on Babcock's chest. Bunch testified that it was a "birthmark of some type or something similar." He also testified that it could have been a wart. Graveley testified that Babcock had no warts or birthmarks, but that she did observe an acne blemish. During closing, the prosecutor argued that Bunch might have seen a large pimple or a scab, apparently accepting Graveley's testimony that Babcock had no birthmark.

Moreover, Chandler's offered testimony was of only limited value for impeachment. Babcock was charged with four separate sales of cocaine, and Bunch's statement about the birthmark only related to the first transaction. Officer Dorcas, who was monitoring Bunch from a vehicle parked nearby, indicated that he personally knew Babcock and that he had seen her in the Rainbow Bar earlier on the evening of March 4. Bunch's description of Babcock's chest was only one part of a detailed physical description; his identification was corroborated by Officer Dorcas, who monitored the transaction on March 17 and recognized Babcock's voice. Babcock did not argue an alibi or offer evidence suggesting that she was not present on the four occasions in question. Further, this is not a situation where criminality is predicated on a stranger's identification based only on a fleeting observation of the alleged defendant. *Cf. State v. Contreras*, 674 P.2d 792 (Alaska App.1983), *petition for hearing granted* (Alaska, April 5, 1984) (discussing problems associated with eyewitness identifications). Bunch's testimony linking Babcock to the transaction was also corroborated by her giving him Ray Chandler's telephone number. The defense exhaustively cross-examined Bunch and Dorcas. Any additional impeachment value of Ray Chandler's testimony would have been insignificant. *See Jordan v. State*, 276 S.E.2d at 240 (where defense counsel urged jury not to believe witness in closing and trial court charged the jury about credibility and impeachment, exclusion of a defense witness's extrinsic impeachment testimony was harmless beyond a reasonable doubt). *See also United States v. Atkins*, 487 F.2d 257, 259 (8th Cir.1973) (no prejudicial error in exclusion of testimony which was merely cumulative to other similar testimony introduced to impeach former witness).

The judgment of the superior court is AFFIRMED.