**Robert Leo HARRIS Jr., Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–9548.

Court of Appeals of Alaska.

Oct. 31, 2008.

Paul E. Malin, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

W.H. Hawley Jr., Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

The primary issue presented in this appeal is whether, and under what circumstances, a trial judge has the authority to exclude or restrict expert testimony offered by the defendant in a criminal case if the judge finds that the defense attorney has willfully (that is, purposely) violated the duty imposed by Alaska Criminal Rule 16(c)(4) to disclose that evidence before trial.

Under federal law, a judge clearly has this authority. In *Taylor v. Illinois*, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988), the United States Supreme Court upheld a trial judge's exclusion of a defense witness after the defense attorney willfully violated the duty under Illinois law to disclose this witness.[1] The defendant in *Taylor* argued that the Sixth Amendment absolutely barred the states from excluding potentially exculpatory evidence as a penalty for a discovery violation, but the Supreme Court rejected that

---

1. *Taylor,* 484 U.S. at 405, 108 S.Ct. at 651.

contention.[2] The defendant in *Taylor* also argued that it was fundamentally "unfair to visit the sins of the lawyer upon [the] client".[3] The Supreme Court rejected that contention as well:

Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision to forgo cross-examination, to decide not to put certain witnesses on the stand, or to decide not to disclose the identity of certain witnesses in advance of trial. In this case, [the] petitioner has no greater right to disavow his lawyer's decision to conceal [the witness's] identity until after the trial had commenced than he has to disavow the decision to refrain from adducing testimony from the eyewitnesses who were [properly] identified [before trial].

*Taylor*, 484 U.S. at 418, 108 S.Ct. at 658.

Alaska Criminal Rule 16(c)(4)—the rule that governs a defendant's duty to disclose expert testimony to the government before trial—also explicitly grants trial judges the authority to exclude the expert testimony if the judge concludes (1) that the defense attorney has violated the duty of pre-trial disclosure, and (2) that a continuance is not an adequate remedy for the defense attorney's violation:

Failure to provide timely disclosure under this rule shall entitle the prosecutor to a continuance. If the court finds that a continuance is not an adequate remedy under the circumstances of the case, the court may impose other sanctions, including prohibiting the defendant from calling the expert at trial.

In the present appeal, the defendant makes alternative arguments. First, the defendant argues that his trial attorney did not willfully violate the duty of disclosure imposed by Criminal Rule 16(c)(4). But this is a question of fact. The trial judge expressly found that the defense attorney acted willfully—*i.e.*, that he knowingly violated the duty of disclosure with a conscious motive to handicap the State at trial. The record supports this finding.

Next, the defendant argues that even if his attorney willfully violated Criminal Rule 16(c)(4), the trial judge abused his discretion when the judge concluded that the attorney's violation of the rule could not be adequately remedied by a continuance. But as we explain in this opinion, the defendant's trial had previously been continued, several months before, to give the defense attorney time to comply with Criminal Rule 16(c)(4). Under the circumstances presented here, it was not an abuse of discretion for the trial judge to conclude that another continuance was not adequate to cure the prejudice to the State and to ensure that there would be no further violations.

Finally, the defendant asks us to reject *Taylor* as a matter of state constitutional law, and to declare that Alaska Criminal Rule 16(c)(4) is unconstitutional to the extent that it authorizes exclusion or restriction of expert testimony as a sanction for a willful discovery violation. In other words, the defendant asks us to hold that, under the Alaska Constitution, it is never permissible for a trial judge to use exclusion of evidence as a sanction for a defense attorney's violation of the duty of pre-trial disclosure—no matter how egregious the violation, and no matter how much the violation prejudices the government.

But like the statutes enacted by the Alaska Legislature, all rules promulgated by the Alaska Supreme Court are presumed to be constitutional. For the reasons explained in this opinion, we conclude that the defendant has failed to rebut the presumption of constitutionality that attaches to Criminal Rule 16(c)(4).

*The underlying criminal allegation*

A Juneau grand jury indicted Robert Leo Harris Jr. for both first- and second-degree assault upon an infant. The indictment charged that, sometime between July 1, 2003 (the date of the infant's birth) and October 13, 2003, Harris inflicted brain injury on the infant (first-degree assault) and also broke several of his ribs (second-degree assault).

---

**2.** *Id.*, 484 U.S. at 410–416, 108 S.Ct. at 653–56.

**3.** *Id.*, 484 U.S. at 416, 108 S.Ct. at 657.

Harris was also indicted on a separate count of second-degree assault for allegedly breaking the infant's arm on November 7, 2003.

The baby was born on July 1, 2003 to Harris and his girlfriend, Shannon Renton. According to the State's evidence, the baby suffered a seizure on the afternoon of October 12, 2003. Just before this seizure, the baby vomited, had a slight fever, and appeared to be "out of it". Then the baby's eyes rolled upward and began to "flicker", the baby's fingers started jerking, and his body began to twitch. Harris and Renton took the baby to the hospital.

At the hospital, a pediatrician administered anti-seizure medicine, and the baby's condition stabilized. However, during the night, the baby again began to seize, and it took a long time to stabilize him. The pediatrician decided to have the baby medevacked to Seattle. In preparation for transporting the baby, x-rays were taken. These x-rays showed that the baby had healing rib fractures.

In Seattle, doctors confirmed that the baby had healing fractures on at least five of his ribs. The doctors also found signs that the baby had been deprived of oxygen for a significant period of time, causing severe and irreversible damage to his brain.

According to the treating physician, unless an infant has been in a car crash or has fallen from a great height, rib fractures of the type observed in this case are most likely caused by non-accidental trauma (*i.e.*, physical abuse). Moreover, the location of this baby's fractures was typical for the fractures caused by holding a baby and applying inappropriate pressure to its body.

Harris's and Renton's baby was born prematurely. At trial, a physician who reviewed the baby's x-rays acknowledged that premature babies sometimes have problems with weak bones. However, this physician testified that there was no evidence of any abnormalities in this baby's bones that might have caused the rib injuries.

While the baby was being treated in Seattle, the police interviewed Harris's daughter, A.H. The police asked A.H. whether she had ever seen her father or Renton hurt the baby. A.H. said no. However, after this first interview, A.H. told her school counselor and another police officer that she had not told the interviewer everything she observed.

A.H. stated that she had seen her father do things to the baby that made her uncomfortable: she had seen her father put the baby face down on the bed and then push or rub the baby's body into the bed for a few seconds to get him to stop crying. She had also seen her father push the baby's chin upwards, to force his mouth closed and muffle his crying. A.H. stated that both she and Renton had told Harris not to do this, but that Harris did not listen to them.

On October 29, 2003, the baby was discharged from the hospital in Seattle into the custody of Harris's sister, Linnea Harris. However, both Harris and Renton lived with Linnea, so they continued to have physical access to the baby.

On November 6, the baby's guardian ad litem, Jeanine Reep, visited Linnea Harris's home. Harris and Renton were there when Reep arrived. The baby was asleep for most of Reep's visit, but toward the end of the visit the baby woke up and vomited. After Reep left, Renton took the baby into the shower to bathe him. According to Linnea, after this bathing was over, Renton called Harris to come take the baby. Harris got the baby, wrapped him in a towel or blanket, and brought him into the living room and laid him on the couch.

When Harris unwrapped the baby, it was obvious that there was something wrong: the baby was screaming and seemed to be in pain, and his arm was not moving. Harris and his sister Linnea took the baby to the hospital.

At the hospital, the baby was found to have a mid-shaft fracture of the right humerus (*i.e.*, a fracture in the middle of his upper right arm). The attending doctor noted that this type of injury is "consistent with the patient being grabbed in the elbow region and ... force being applied to the humerus ... [so that] the apex of the fracture ben[ds] outward from the body."

Harris and Linnea denied that they had intentionally injured the baby. Later, when

Renton arrived at the hospital, she too denied causing any injury to the baby. Both Harris and Renton told the doctor that, even before Reep's visit, they had noticed that the baby was not moving his right arm, and they called the doctor's office to make an appointment. Then, when the baby grew fussy and vomited after feeding, and when his arm did not improve, they decided to bring the baby to the emergency room.

A few days later, on November 12th, when Renton was interviewed by the police, she told the officer that she thought the fracture to the baby's arm occurred when she was bathing him in the shower, or when she wrapped him in a towel after the shower—but she could not figure out how she had hurt him.

A grand jury indicted both Harris and Renton on various counts of mistreating and injuring the baby. Following a jury trial, Harris was found guilty of assault in the third degree for breaking the baby's arm. The jury acquitted Harris and Renton of the remaining charges.

*The facts underlying the defense attorney's violation of Criminal Rule 16(c)(4) and the superior court's pre-trial discovery order—and an explanation of the trial judge's ruling*

Harris's trial was originally scheduled for the last week in October 2004.

On August 17, 2004, Superior Court Judge Larry R. Weeks issued an omnibus hearing order. One section of this order set a deadline of 45 days before trial for the State to disclose all information concerning its expert witnesses (*i.e.,* the information required by Criminal Rule 16(b)(1)(B)). Another section of this order—a section that is of primary importance to Harris's case—set a deadline of 30 days before trial for "the defendant [to] make the expert witness disclosures required by [Criminal] Rule 16(c)(4)".

Alaska Criminal Rule 16(c)(4) governs a defendant's obligation to disclose expert witnesses and the substance of their proposed testimony to the government before trial. Here is how that duty of disclosure is defined in the rule:

(4) *Expert Witnesses.* Unless a different date is set by the court, no later than 30 days prior to trial, the defendant shall inform the prosecutor of the names and addresses of any expert witnesses the defendant is likely to call at trial. The defendant shall also make available for inspection and copying any reports or written statements of these experts. For each such expert witness, the defendant shall also furnish to the prosecutor a curriculum vitae and a written description of the substance of the proposed testimony of the expert, the expert's opinion, and the underlying basis of that opinion.

For reasons that are not pertinent to the present appeal, after Judge Weeks issued the omnibus hearing order, Harris's trial was rescheduled from October 2004 to a new starting date of January 10, 2005.

On December 2, 2004 (*i.e.,* 39 days before the scheduled trial date), Harris's attorney, Assistant Public Defender Eric Hedland, filed a notice stating that the defense intended to rely on the expert testimony of Dr. Janice J. Ophoven. According to this notice, Hedland intended to have Dr. Ophoven testify "regarding [the] possible causes of [the baby's] injuries".

A copy of Ophoven's *curriculum vitae* accompanied this notice, but Hedland offered no description of the substance of Ophoven's proposed testimony—that is, no description of Ophoven's conclusions, nor any explanation of the underlying bases for those conclusions. Instead, Hedland offered the following:

Nor [*sic*] report is yet available. A more detailed description of Dr. Ophoven's proposed testimony will be provided when received.

Five days later, on December 7th, the prosecutor sent a memo to Hedland, asking him when the State could expect to receive Dr. Ophoven's report. The prosecutor explained, "I cannot prepare for Dr. Ophoven['s testimony] or [investigate potential] rebuttal without a report indicating what her opinion is and the basis for it." The prosecutor added, "If I have not received a written report from Dr. Ophoven by December 13, 2004"—*i.e.,* by the expiration of the 30–day pre-trial

deadline established in the omnibus hearing order [4]—"I will be filing a motion with the court to preclude her testimony."

The prosecutor waited another ten days for a description of Dr. Ophoven's proposed testimony, or for some other response to his memo. None arrived. On December 17th, with Harris's trial just over three weeks away, the prosecutor filed a motion asking Judge Weeks to preclude the defense from presenting Ophoven's testimony.

In this motion, the prosecutor noted that medical testimony would be a "central component" of the State's case against Harris, and the prosecutor asserted that the State had gone to "considerable effort and great difficulty [to arrange] for a number of physicians to testify on January 11th and 12th" (*i.e.*, the second and third scheduled days of Harris's trial). The prosecutor further asserted that several of these physicians were being flown to Juneau from other states, and that a continuance of trial was not an adequate remedy for the discovery violation because there was "a risk that the State would lose important witnesses".

That same day—December 17, 2004—Harris's attorney filed a motion to continue the trial. In this motion, Hedland asserted that a delay of trial was needed because his expert, Dr. Ophoven, had just been sent the medical records in the case, and she "[would] need more time to review the reports and medical records to formulate an opinion".

On December 27th, Judge Weeks conditionally granted the defense request for a delay of the trial. (The condition was that the parties would agree to take a video deposition of Harris's daughter, A.H., with the understanding that this deposition would be admissible at Harris's trial.)

Three days later, on December 30, 2004, the parties came to court for a hearing, and Judge Weeks explicitly warned the defense attorney:

> *The Court:* I will order that [the defense] provide [the required disclosure] 30 days prior to [the trial date]. . . . I will not allow experts to testify about things that

are not provided to opposing parties in expert reports. So, if there is no report by 30 days prior [to trial], [that expert] will not be testifying. And [if] things [are] not included in the reports, [those experts] won't be testifying about those things [that are not] in the reports. That's the way it is.

Harris's trial was recalendared for May 2, 2005.

On April 6, 2005, defense attorney Hedland filed another notice that he intended to have Dr. Ophoven give expert testimony at Harris's trial. In this notice, Hedland declared that Dr. Ophoven "did not create a written report". However, Hedland offered the following description of Ophoven's proposed testimony:

> Dr. Ophoven will testify that prematurely born babies are at an increased risk for injury during normal care because they are weaker physically, and that babies who are immobilized after birth are at a terrible risk for abnormal bone strength. She will testify that, based on her review of the medical reports, the alleged victim here was released from the hospital too quickly after birth. [Dr. Ophoven] will also testify that a child who presents with seizures is not necessarily suffering from traumatic injury. She will testify that estimating dates of [bone] fractures from x-rays is an inexact science. She will testify that babies can asphyxiate from treatment for seizures, and that seizures that last too long can result in cerebral edema.

After the defense attorney filed this notice, Harris's trial was delayed again (because the prosecutor assigned to Harris's case was handling another trial that was still in progress on May 2nd). This time, Harris's trial was rescheduled for September 12, 2005.

On August 8, 2005, Hedland sent a memo to the prosecutor in which he offered another description of Dr. Ophoven's proposed testimony. For purposes of later discussion, the most important aspect of this memo is that it contains many medical assertions and conclusions, but it provides very little explanation

---

4. The pre-trial disclosure deadline expired on Monday December 13th because the 30th day before trial (December 11th) fell on a Saturday. *See* Alaska Criminal Rule 40(a).

of the doctor's bases for these assertions and conclusions. Here is the text of the memo:

Dr. Ophoven is a seizure specialist. There are many kinds of seizures and many causes. [The baby in this case] had an unusual kind of seizure.

[The baby] did not receive proper care until he arrived at Harborview [hospital in Seattle]. [The] ER admission order says that he [was] diagnosed with status epilepticus and [was] suspected of having sepsis. Untreated status epilepticus for a half-hour or more constitutes a medical emergency.

These [*sic*] are many possible causes of [the baby's] seizures. [The baby] shows no brain trauma of any kind. There is no evidence that [the baby] suffocated.

[The baby's] rib fractures and his seizures are not related. Bone scans do not tell [the] same story as x-rays.

The [other] doctor's grand jury testimony that premature babies do not have weaker bones is absolutely not true. Osteopenia of prematurity is well documented. Other factors present here increase the risk of accidental fractures. [During the] first year of life, many things make a person susceptible to seizures. Children in the NICU [*i.e.*, the neonatal ICU] get fractured arms, legs, and ribs just through daily care, because of the weakness of their bones.

Some things that could cause fractured ribs include burping a baby, rolling over the baby accidentally while sleeping in the same bed, falling off of a couch, the actions of a babysitter. Additionally, there is no evidence of inflicted injury in either the case of the [baby's] seizures or the case of the [baby's] broken arm.

On August 29, 2005 (*i.e.*, about two weeks before trial), the prosecutor again filed a motion to preclude the defense from calling Ophoven as an expert.

In this motion, the prosecutor noted that he still had received no report from Dr. Ophoven. The prosecutor acknowledged receiving Hedland's memo of August 8th, but the prosecutor described that memo as "very uninformative" because it failed to "provide adequate notice of the opinions ... that Dr. Ophoven w[ould] testify to[,] or the basis for those opinions". The prosecutor also noted that, because Hedland's memo was not Ophoven's report, Ophoven "[was] not bound by anything in [that memo,] and Mr. Hedland is not available as a witness [himself]."

The prosecutor asserted that Hedland's handling of this matter—in particular, his "failure ... to provide a report by Dr. Ophoven, after obtaining a continuance for that very purpose"—was a "tactical gambit designed to prevent the State from having an effective opportunity to cross-examine the expert."

Two days later (on August 31st), Hedland filed an opposition to the State's motion. The majority of this opposition was devoted to arguing that the State had failed to live up to its own obligation to disclose expert testimony. However, one paragraph of the opposition did address the prosecutor's claim that there had been inadequate disclosure of Dr. Ophoven's proposed testimony:

Mr. Harris has filed [two] written descriptions of ... Dr. Ophoven['s testimony]. The prosecutor, in fact, attached them to his motion. Mr. Harris also long ago provided the [doctor's] C.V.[.] Not only has Mr. Harris complied with the rules, [but] the state additionally has the present ability to gather any additional information from Dr. Ophoven ..., and it has yet the further ability to call/consult the myriad doctors referenced in [the] medical records [in this case]. And the state has also cross-examined Dr. Ophoven at least twice recently [in other cases] in Juneau[,] and is familiar with her. Finally, her publications are readily available.

On Friday, September 9, 2005, with Harris's trial set to begin the following Monday, Judge Weeks issued an order precluding Dr. Ophoven from testifying.

Judge Weeks began by noting that the omnibus hearing order issued at the very beginning of Harris's case required that "expert reports be provided by the defense 30 days before trial".

Judge Weeks then noted that one of the purposes of Criminal Rule 16 was "to require

[a] meaningful exchange of expert information between the parties". Judge Weeks further noted that the superior court judges of Juneau had traditionally enforced this rule firmly. The judge reminded Hedland that, in his last jury trial before Judge Weeks, "the State was precluded from offering an expert on domestic violence because no report had been submitted, even though everyone knew what the witness would say."

Judge Weeks next reminded Hedland that, the previous December, Hedland had sought a continuance of Harris's trial for the very purpose of giving Dr. Ophoven a better opportunity to prepare as an expert witness— and that, in his pleading, Hedland had told the court that, as of December 17, 2004, "all medical records and other documents [had been] sent to ... Dr. Ophoven".

The judge noted that he had delayed the trial so that Dr. Ophoven would have a chance to testify for the defense. The judge also noted that, when he granted the continuance, he expressly warned Hedland that the defense would have to provide the State with a report for each and every one of its expert witnesses, and that these reports had to be filed 30 days before trial. And the judge quoted what he had said at that hearing on December 30, 2004: "if there is no report by 30 days prior [to trial], [that expert] will not be testifying."

Judge Weeks then concluded:

Trial starts on Monday. There is no report from Dr. Ophoven. The only apparent reason why a report is not available nine months later [*i.e.,* nine months after Harris sought a delay of the trial for the express purpose of procuring Dr. Ophoven's testimony] is the attempt to obtain an unfair tactical advantage. The court finds that [granting another] continuance is not an adequate remedy. The incidents [being litigated] are alleged to have occurred nearly two years ago[,] and the case is over a year old. Numerous other experts have been noticed to testify.

The motion to preclude Dr. Ophoven's testimony is granted on this record.

Later that same day, Hedland filed a motion asking Judge Weeks to reconsider. In that motion, Hedland argued that, even though he had not provided the State with a written report from Dr. Ophoven, he nevertheless *had* complied with Rule 16(c)(4)— because he had filed two written descriptions of Dr. Ophoven's proposed testimony. (Hedland was apparently referring to the notice dated April 6, 2005 (quoted above), and to the memo addressed to the prosecutor dated August 8, 2005 (also quoted above).)

Hedland told Judge Weeks that, "to the extent that [the description of the proposed testimony] needs to be signed by Dr. Ophoven, that can be readily accomplished [now]."

In the alternative, Hedland argued that his client, Harris, should not be penalized because of Hedland's failure to comply with Rule 16(c)(4) and Judge Weeks's previous orders. Hedland contended Harris had a right to present Dr. Ophoven's testimony, and that it would be improper to bar Harris from presenting this testimony as a result of Hedland's errors as counsel.

On the morning of Monday, September 12th—that is, on the first business day after Judge Weeks issued his order, and on the morning when jury selection for Harris's trial was scheduled to commence—Hedland filed Dr. Ophoven's written report.

This report (which bears the date of September 12th) details Dr. Ophoven's findings and opinions in two-and-a-half pages of single-spaced text, using a very small font. The font used in the doctor's report is either 9– or 10–point, and there are 60 lines of text to the page (not counting the line that bears the footer and the page number). By comparison, the font used in this opinion is 13.5–point, and there are 23 or 24 lines of text to the page. If the text of Dr. Ophoven's report were formatted like the text of this opinion, the doctor's findings and opinions would occupy approximately seven pages.

That afternoon, Judge Weeks heard argument on the defense attorney's request for reconsideration of his order precluding Dr. Ophoven's testimony. The prosecutor pointed out that Judge Weeks had been very clear that no expert would be allowed to testify for either side unless that expert's report was

provided to the other side within the deadlines set by the judge.

The prosecutor also pointed to the fact that Dr. Ophoven had generated a lengthy and detailed report so quickly after Judge Weeks issued his order precluding her testimony. The prosecutor argued that this "show[ed] how easy it [was all along] to produce a report from th[is] witness".

Finally, the prosecutor argued that the State would be prejudiced if Dr. Ophoven were allowed to testify, because it would be impossible for the prosecutor to conduct the trial and, at the same time, "get knowledgeable about all those issues [that the doctor] appears to raise in that report" and "prepare rebuttal [on those issues]".

Judge Weeks and the prosecutor then discussed a number of medical issues that appeared to have been raised for the first time in Dr. Ophoven's report.

When Judge Weeks asked Hedland to respond, Hedland declared that he had consulted another attorney in the Public Defender Agency, and that this attorney had assured him that the two documents he had already produced—the notice dated April 6, 2005, and the memo to the prosecutor dated August 8, 2005—were sufficient to satisfy his duty of disclosure. Hedland told Judge Weeks, "I thought a proffer from [a] lawyer *was* an expert report." (Emphasis added)

Hedland also declared that "[he had] learned *since then* that [Judge Weeks] had said, on this case specifically, that there [was] supposed to be a written report by the doctor." (Emphasis added)

(It appears, from this last statement, that Hedland was asserting that he only learned of Judge Weeks's order *after* he submitted the notice in April 2005 and wrote the memo to the prosecutor in August 2005. If this is what Mr. Hedland meant, his assertion is inexplicably at variance with the facts. Hedland was present in court on December 30, 2004, when Judge Weeks orally told the parties that no expert witness would be allowed to testify in this case unless the expert's written report was provided to the other side.)

Finally, Hedland argued that "any sanction ... should be leveled against the lawyer" (that is, against himself) because preclusion of Dr. Ophoven's testimony would deprive Harris of his right to a fair trial.

At the end of the parties' arguments, Judge Weeks took the matter under advisement until the following morning. However, before court adjourned, Judge Weeks asked the prosecutor to come prepared to discuss whether the State would still be prejudiced if (1) the judge precluded Dr. Ophoven from testifying about any matter that was not contained in Hedland's memorandum of August 8th to the prosecutor; (2) the judge allowed the prosecutor to examine the State's own experts about the matters contained in Hedland's memorandum (in other words, the prosecutor would not have to wait for the defense to present testimony on those matters, and then have to re-summon his expert witnesses to offer rebuttal); and (3) the judge ordered the defense to make Dr. Ophoven available for a pre-testimony deposition sometime during the week.

When the parties assembled in court the next morning, the prosecutor indicated that he was agreeable to going forward under the conditions that Judge Weeks had outlined—with the added proviso that, if he found it necessary to present rebuttal testimony from his out-of-state expert witnesses, the defense would agree that this rebuttal testimony could be presented telephonically.

At this point, Hedland demanded to know the precise justification for these proposed limits on the defense case, and these proposed accommodations to the State. Judge Weeks's response is the central factual ruling in this case. Here is what Judge Weeks said:

> *The Court:* Here's what I'll find—and if you need more, I'll try to do more:
>
> I believe that your notice under the rule was inadequate. I don't believe that it [disclosed] the basis for [the doctor's] opinion, and I don't believe that it provided [all of] the opinions. I [further] believe that [your notice] was in violation of this Court's order.

[In addition,] I believe that [this] was an attempt [on your part] to obtain a tactical advantage during trial.

I think that Dr. Ophoven's [late-provided] report significantly substantiates that finding. I believe that the detail of her report makes it clear that the State was going to be sandbagged. . . .

I believe that [this course of conduct] justifies not allowing [Dr. Ophoven] to testify at all. [But] I [have] tried to make these limited accommodations in order to make sure that the clients [*i.e.*, Harris and his co-defendant Renton] are not substantially damaged by [your] attempts to obtain tactical advantage.

. . .

I [further] believe that the State would be substantially prejudiced if [Dr. Ophoven] were allowed to testify to those things in that report [that aren't included in your previous memorandum].

*Defense Attorney:* And the Court is making a finding that a continuance isn't an adequate remedy for the State?

*The Court:* I have [already] made that [finding].

Following more discussion by the parties, Judge Weeks issued an order along the lines outlined in the preceding discussions. That is, (1) the judge ruled that Dr. Ophoven would not be allowed to testify about any matter that was not contained in Hedland's memo to the prosecutor; (2) the judge ordered the defense to make Ophoven available for a deposition by the close of business the following day; (3) the judge ruled that the prosecutor would be allowed to examine the State's own experts about the matters contained in Hedland's notice and letter on direct examination, without having to wait for the defense to present testimony on those matters and then re-summon the expert witnesses to offer rebuttal; and (4) the judge ruled that if the State needed to present expert rebuttal testimony on the matters contained in Hedland's memo, that testimony could be given telephonically. The judge later reduced this order to writing.

*Harris's four arguments as to why the trial judge committed error when he re-stricted the scope of the evidence that Harris's attorney could introduce at trial*

On appeal, Harris makes four different arguments as to why Judge Weeks committed error when he restricted Dr. Ophoven's trial testimony to the matters revealed in Hedland's August 2005 memo to the prosecutor. (Harris does not challenge the other provisions of Judge Weeks's order.)

The first of these arguments is that Judge Weeks actually committed error nine months before Harris's trial—in December 2004, when Judge Weeks told the parties that neither of them would be allowed to present expert testimony unless they produced that expert's report to the opposing attorney within the time limits set forth in the omnibus hearing order (*i.e.*, 45 days before trial for the State, and 30 days before trial for the defense).

Harris's other three arguments are direct attacks on Judge Weeks's ruling of September 12, 2005—*i.e.*, the ruling issued on the first day of trial, which restricted the scope of Dr. Ophoven's testimony.

Harris's second argument is that, when Judge Weeks restricted the scope of Dr. Ophoven's testimony, the judge violated Alaska law by imposing this type of sanction (*i.e.*, exclusion or restriction of evidence) when there was no proof that the defense had willfully violated its pre-trial disclosure obligations.

Harris's third argument is that, even if Hedland willfully violated his disclosure obligations, it was improper for Judge Weeks to restrict Dr. Ophoven's testimony—because, according to Harris, lesser sanctions would have been sufficient to cure the problem.

Fourth and finally, Harris argues in the alternative that, to the extent current Alaska law supports Judge Weeks's ruling, that law is unconstitutional. Harris contends that, no matter how egregiously a defense attorney might violate the disclosure obligations imposed by Criminal Rule 16(c), and no matter how much prejudice that violation might cause to the government and to the judicial process, the Alaska Constitution forbids a judge from restricting a criminal defendant's presentation of evidence as a sanction for the

violation, at least absent proof that the defendant was personally involved in the discovery violation.

*Harris's argument that Judge Weeks's order of December 30, 2004 was, in effect, a "local rule of practice"—and that this local rule was unlawful because it conflicted with the provisions of Criminal Rule 16(c)(4)*

In *Romero v. Alaska Financial Services, Inc.*, 873 P.2d 1278, 1280 (Alaska 1994), the Alaska Supreme Court declared that trial courts are prohibited from adopting local practices that conflict with the rules codified in the Alaska Rules of Court. Harris contends that Judge Weeks violated this principle when, on December 30, 2004, the judge ordered that no expert witness would be allowed to testify in this case unless the proponent of the expert's testimony provided the expert's report to the other side.

▮▮▮ Harris did not raise this claim of error during the trial court proceedings. In fact, he never challenged Judge Weeks's authority to issue the order of December 30th on this or any other ground. Thus, Harris failed to preserve this issue for appeal. And, to the extent that Harris is nevertheless entitled to raise this claim as a matter of plain error, we find no plain error.

Criminal Rule 16(c)(4) declares that, with respect to any expert witnesses that the defendant is likely to call at trial,

> [t]he defendant shall ... make available for inspection and copying any reports or written statements of these experts. For each such expert witness, the defendant shall also furnish to the prosecutor a curriculum vitae and a written description of the substance of the proposed testimony of the expert, the expert's opinion, and the underlying basis of that opinion.

From the wording of this portion of Rule 16(c)(4), it appears that the rule requires the defense to disclose two things. First, if the expert has produced any report or written statement, that report or written statement must be disclosed. Second, regardless of whether the expert has produced a report or written statement, the defense must *"also furnish ...* a written description of the substance of the proposed testimony of the expert, the expert's opinion, and the underlying basis of that opinion." (Emphasis added)

To our knowledge, no Alaska appellate case has presented the issue of whether a defense attorney is required to separately provide a written description of the substance of the expert witness's proposed testimony (including the expert's opinion and the underlying basis for that opinion) if that expert witness has already furnished a written report that fully describes these same things. For present purposes, we will assume that this is an unintended redundancy.

But even employing this assumption, Rule 16(c)(4) is clearly designed to require defendants to disclose the substance of the expert's proposed testimony one way or another—and not just the basic subject matter of that testimony, but the expert's specific opinions and conclusions, as well as the underlying bases of those opinions and conclusions. This disclosure may take the form of a written report or statement from the expert witness, or a written description of the proposed testimony by the defense attorney, or (conceivably) both. But the disclosure must be made.

Here, Harris's attorney failed to make the required disclosure. Judge Weeks's decision to limit the scope of Dr. Ophoven's testimony was not based on Hedland's failure to follow the particular procedures specified in the discovery order—as, for instance, if Hedland had filed his own complete written description of Dr. Ophoven's conclusions and the bases for those conclusions, instead of complying with Judge Weeks's directive to file a written report from Ophoven herself. Rather, Judge Weeks's ruling was based on the fact that Hedland flouted his discovery order. The judge restricted the scope of Dr. Ophoven's testimony because Hedland *never* disclosed the full substance of the doctor's proposed testimony before trial.

(As explained above, full disclosure was not made until Hedland submitted the doctor's written report on the first morning of trial.)

Thus, for purposes of resolving Harris's case, it is irrelevant whether it is consistent or inconsistent with Rule 16(c)(4) for a trial

judge to insist on an exchange of written reports from the experts themselves, rather than allowing the attorneys to exchange their own written descriptions of the experts' conclusions and reasoning. And because this issue is irrelevant to the resolution of Harris's case, Judge Weeks's order of December 30, 2004 can not constitute plain error. Proper or improper, the issuance of this order did not affect the outcome of the proceedings. Rather, Hedland's misconduct was in failing to disclose the full substance of Dr. Ophoven's proposed testimony in any form.

*Harris's argument that Alaska law forbids a judge from excluding evidence as a sanction for a pre-trial discovery violation unless the violation was willful*

Harris next argues that Alaska law does not allow a judge to restrict or exclude evidence as a sanction for a discovery violation unless that violation was "deliberate" and "unequivocal". According to Harris, this sanction can be imposed only when the offending counsel "figuratively thumbed his nose at [the] applicable requirements of pre-trial discovery and demonstrated deliberate . . . disregard of the court's authority".

Harris contends that Judge Weeks violated this tenet of Alaska law when he restricted the scope of Dr. Ophoven's testimony as a sanction for Hedland's violation of his pre-trial disclosure obligations—because, according to Harris, there was no proof that Hedland deliberately violated these obligations.

Harris's terminology is somewhat at variance with the language employed in the Alaska cases on this subject, but the principle he relies on is basically correct. The Alaska Supreme Court has repeatedly declared that even when there is a clear violation of the discovery rules, a judge should not use that discovery violation as a basis for granting judgement to the non-offending party, or as a basis for excluding crucial evidence (*i.e.*, evidence so important that its exclusion will essentially decide a central issue in the litigation one way or the other), unless the violation was "willful".

In this context, a violation is not "willful" if it arises from a mistaken but good-faith resistance to the discovery obligation, or if the party was unable to comply with the discovery obligation in a timely manner, or if the violation consisted merely of inordinate delay in complying with the obligation. Rather, a violation is "willful" for these purposes only if it was done with "conscious intent to impede discovery". *Maines v. Kenworth Alaska, Inc.,* 155 P.3d 318, 325 (Alaska 2007); *Lee v. State,* 141 P.3d 342, 349 (Alaska 2006); *Honda Motor Co., Ltd. v. Salzman,* 751 P.2d 489, 492–93 (Alaska 1988).

However, when a party fails to comply with a discovery obligation, the burden of proving non-willfulness is on the party who failed to comply.[5] The rationale for placing the burden of persuasion on the non-complying party is that "[t]he reasons for [the] noncompliance are facts peculiarly within [the offending party's] knowledge." *Honda Motor Co.,* 751 P.2d at 492.

In Harris's brief to this Court, he argues that Hedland's failure to disclose the substance of Dr. Ophoven's intended testimony until the first morning of trial was not willful.

Harris points out that, when Judge Weeks asked Hedland to explain his conduct, Hedland asserted that (1) he honestly believed that he had complied with his discovery obligation by sending the notice to the court in April 2005, followed by his memo to the prosecutor in August 2005; and that (2) he checked with his supervisor in the Public Defender Agency, who assured him that these actions constituted compliance with Rule 16(c)(4). In addition, Harris points out that Hedland did, in fact, ultimately provide Dr. Ophoven's written report to the State.

The problem with this argument is that Judge Weeks heard Hedland's protestations of good faith, and he rejected them.

We quoted Judge Weeks's ruling earlier in this opinion. As we explained, Judge Weeks expressly found that Hedland's pre-trial description of Dr. Ophoven's proposed testimony violated both Criminal Rule 16(c)(4) and

---

5. *DeNardo v. ABC Inc. RVs Motorhomes,* 51 P.3d 919, 923 (Alaska 2002); *Hughes v. Bobich,* 875 P.2d 749, 753 (Alaska 1994); *Honda Motor Co.,* 751 P.2d at 492; *Hawes Firearms Co. v. Edwards,* 634 P.2d 377, 378 n. 2 (Alaska 1981).

Judge Weeks's order regarding pre-trial disclosure of expert witnesses—because Hedland did not fully disclose the doctor's opinions, nor did he disclose the bases for those opinions.

Judge Weeks further found that this non-disclosure "was an attempt [on Hedland's part] to obtain a tactical advantage during trial." The judge concluded that Hedland's sudden disclosure of a lengthy and detailed report from Dr. Ophoven on the first morning of trial "significantly substantiate[d]" the conclusion that Hedland had been acting in bad faith. Judge Weeks declared, "I believe that the detail of [Dr. Ophoven's] report makes it clear that the State was going to be sandbagged." In other words, Judge Weeks found that Hedland purposely withheld Dr. Ophoven's report with the intent to defeat the State's right of discovery and to unlawfully put the State in a position of disadvantage at trial.

We are obliged to uphold Judge Weeks's findings of historical fact—*i.e.*, the judge's findings regarding Hedland's intentions and motives—unless Harris shows these findings to be clearly erroneous. He has not done so.

Because Judge Weeks found that Hedland was acting in bad faith—*i.e.*, acting with the conscious intent to impede pre-trial discovery—the judge was entitled to consider restriction or exclusion of evidence as a sanction for the discovery violation.

*Harris's argument that, even if Hedland acted willfully, Judge Weeks was still required to impose lesser sanctions because lesser sanctions would have been sufficient*

Harris's third argument is that, even if Hedland willfully violated his obligation to disclose the full substance of Dr. Ophoven's intended testimony, it was still improper for Judge Weeks to restrict Ophoven's testimony—because, according to Harris, lesser sanctions would have been sufficient to cure the prejudice to the State and to ensure future compliance with pre-trial disclosure obligations.

■ The Alaska Supreme Court has said that, even when a party has willfully violated

their duty of pre-trial disclosure, the trial judge should not impose a sanction that has the effect of establishing or dismissing a claim or defense unless the judge has first considered whether lesser sanctions would adequately cure the prejudice to the other party and ensure compliance with the discovery rules in the future.[6] This same limitation applies to orders that preclude an expert witness from testifying, if the preclusion of the expert's testimony "effectively determin[es] a central issue in the litigation".[7]

Regarding the first prong of this test (*i.e.*, whether a lesser sanction would be adequate to cure the prejudice to the other party), the Alaska Supreme Court has explained that the primary question to be answered is whether it would be fair to force the non-offending party to litigate the merits of the claim or issue involved "without disclosure of the evidence [that] the court ... ordered the [offending] party to produce." *Lee*, 141 P.3d at 350; *DeNardo v. ABC Inc. RVs Motorhomes*, 51 P.3d 919, 926 (Alaska 2002).

■ In other words, if the claim or issue could still be fairly litigated even though the offending party purposely withheld relevant information, then the trial judge is not allowed to use preclusion or restriction of this evidence as a punishment for the discovery violation. *Lee*, 141 P.3d at 350; *DeNardo*, 51 P.3d at 926. As the supreme court stated in *Johnson v. State*, 577 P.2d 230, 234 (Alaska 1978), "In the absence of ... prejudice to a party [that is] likely to have a substantial effect on the outcome of the case, failure of counsel to comply with discovery orders should not be utilized as a basis for ultimate disposition of litigation."

■ On the other hand, if the offending party has purposely withheld information that is central to the litigation of a claim or issue, so that the non-offending party's lack of opportunity to prepare to meet this information will substantially prejudice the party's ability to litigate the claim or issue, then a trial judge has the authority to restrict or

---

6. *Maines*, 155 P.3d at 325.

7. *Id.*

preclude the presentation of the unlawfully withheld evidence. *Lee,* 141 P.3d at 350–51.

Regarding the second prong of this test (*i.e.,* ensuring compliance with pre-trial disclosure obligations in the future), the supreme court has focused primarily on whether the offending party has displayed a pattern of non-disclosure that needs to be deterred.[8]

In *Lee,* for example, the State brought a consumer fraud case against the defendant, who claimed to be marketing new technologies that would allow people to generate electrical power for little or no money. Lee (who was represented by counsel in the trial court, *see* 141 P.3d at 353) refused to obey discovery orders that directed him to explain his products and technologies. Without this pre-trial disclosure, the State "had little information about Lee, his businesses, his technologies, and his 'free electricity' program." *Id.* at 350.

In light of Lee's willful failure to provide pre-trial disclosure of this information, the trial judge entered judgement against Lee on the issue of whether he had committed consumer fraud—and the supreme court upheld the trial judge's action.

The supreme court declared that, even in the face of willful discovery violations, a trial judge "may not issue liability-establishing sanctions without first exploring possible and meaningful alternatives". *Id.* at 351. But the supreme court concluded that the trial judge had not abused her discretion when she decided that there were no viable alternatives in Lee's case. *Id.*

The supreme court noted that the trial judge considered imposing fees on Lee, and considered delaying the trial, but found those sanctions to be inappropriate because they would not deter future discovery violations, or they would prejudice the State. *Id.* The supreme court further noted that the trial judge had already given Lee "numerous opportunities" to comply with the pre-trial discovery order. *Id.*

Quoting the trial judge's decision—a decision which the supreme court called "a model analysis of the pertinent factors" [9]—the supreme court approved the trial judge's conclusion that, "[while a] monetary sanction c[ould] compensate the State for its attorney's fees", such a sanction could not compensate for "the [State's] inability to prepare its case for trial". *Lee,* 141 P.3d at 354.

As the supreme court explained,

The state could not take the chance that Lee, having failed to provide adequate discovery responses, would attempt to demonstrate [the validity of] his technologies and products at trial. We assume that the science underlying the technologies and products Lee advertised is sufficiently complex that, without pretrial discovery, the state would have had inadequate time to examine and understand the scientific principles pertinent to any demonstration, and consequently might have been unable to dispute whether the demonstration was valid or the principles were invalid. For these reasons, the sanction imposed—accepting the [State's] alleg[ation of consumer fraud] as admitted—was sufficiently tailored to the discovery violation.

*Lee,* 141 P.3d at 350–51.

The supreme court also approved the trial judge's conclusion that "a delay in the trial date to allow another opportunity [for Lee] to complete discovery [would] prejudice[ ] the State, not the Defendant." *Lee,* 141 P.3d at 354.

Given these circumstances, the supreme court concluded that the trial judge had not abused her discretion when she entered judgement against Lee on the issue of whether he had committed fraud.

The supreme court employed essentially the same test and analysis when the court upheld the imposition of litigation-ending sanctions in *Honda Motor Co., Ltd. v. Salzman,* 751 P.2d 489 (Alaska 1988):

The [record] shows beyond doubt that [the trial judge] gave Honda's situation very careful consideration [before imposing such a severe sanction]. [The judge]

---

8. *See Lee,* 141 P.3d at 350; *DeNardo,* 51 P.3d at 927; *Honda Motor Co.,* 751 P.2d at 493.

9. *Lee,* 141 P.3d at 351.

had given Honda several warnings, oral and written, which Honda failed to heed. She had extended deadlines, imposed less drastic sanctions, and endured Honda's violations of court orders until it became evident that this ultimate sanction was necessary and appropriate. Honda's contention that it fully cooperated and made extraordinary efforts to comply with discovery is simply contradicted by the record. Although Honda produced some documents and provided for the depositions of two Japanese witnesses, the fact is that every single court order compelling production was violated, and the violations simply were not adequately explained by Honda. We cannot say that the trial court abused its discretion in imposing this sanction.

751 P.2d at 493.

Harris argues that, even though this may be a proper method of analysis in civil cases, the policies are different in criminal cases— especially when a trial judge is considering sanctions against the defendant. Harris asserts that, because of a defendant's constitutional right to subpoena favorable witnesses and affirmatively present a defense case, a trial judge should rarely be able to order preclusion or restriction of defense evidence under Criminal Rule 16(c)(4), even when the defense has willfully violated the discovery rules.

It is true that, with one exception (*Johnson v. State*), the supreme court decisions we have discussed here arose in the context of civil litigation. We further acknowledge that in *State v. Lewis,* 632 P.2d 547 (Alaska App. 1981)—this Court's most comprehensive discussion of this issue to date—we declared that preclusion of significant evidence in criminal cases was a disfavored remedy that

"should be used ... only in rare situations". *Id.* at 550.

However, *Lewis* was decided in 1981. At that time, the sole portion of Criminal Rule 16 that addressed potential sanctions and remedies for discovery violations was subsection (e):

(1) *Failure to Comply with Discovery Rule or Order.* If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order [that] party to permit the discovery of material and information not previously disclosed[,] or enter such other order as it deems just under the circumstances.

(2) *Willful Violations.* Willful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court.

As this Court noted in *Lewis,* the language of subsection (e)(1)—in particular, the clause "or enter such other order as [the court] deems just under the circumstances"—tracks the language of the 1978 Second Edition of the American Bar Association's *Standards Relating to Discovery and Procedure Before Trial,* § 11–4.7(a)(iii). In the Commentary that accompanied Standard § 11–4.7(a), the ABA drafters declared that this phrase "[was] not intended to endorse" sanctions "that exclude from evidence any discoverable, but [as yet] nondisclosed, items". *Id.,* page 11•67.[10]

But Alaska law has changed since *Lewis* was decided. In February 1995, the Alaska Supreme Court amended the provisions of Criminal Rule 16(b) and (c) dealing

---

**10.** The most current version of the ABA Standards—*i.e.,* the Third Edition published in 1996—now cautiously endorses the exclusion of evidence as a sanction for egregious discovery violations. Here is the text of Standard § 11–7.1(a) ("Sanctions") of the ABA's *Standards Relating to [Criminal] Discovery:*

(a) If an applicable discovery rule or an order issued pursuant thereto is not promptly implemented, the court should do one or more of the following:

(i) order the noncomplying party to permit the discovery of the material and information not previously disclosed;
(ii) grant a continuance;
(iii) prohibit the party from calling a witness or introducing into evidence the material not disclosed, subject to the defendant's right to present a defense and provided that the exclusion does not work an injustice either to the prosecution or the defense; and/or
(iv) enter such other order as it deems just under the circumstances.

with expert testimony. *See* Supreme Court Order No. 1191 (effective July 15, 1995).

The pre–1995 provisions dealing with expert testimony—Rule 16(b)(1)(iv) (government experts) and Rule 16(c)(4) (defense experts)—declared that both the prosecution and the defense had the duty to disclose the "reports or statements" of its experts to the other side. But these pre–1995 provisions said nothing about the potential sanctions for violating this duty. Presumably, any failures to disclose proposed expert testimony would have been subject to the types of sanctions discussed in Rule 16(e) and in the *Lewis* decision.

But under the current (*i.e.*, the post–1995) version of Rule 16, the two provisions dealing with expert testimony—*i.e.*, a new Rule 16(b)(1)(B) (government experts) and a revised Rule 16(c)(4) (defense experts)—both contain language that explicitly addresses the range of sanctions available to a trial judge when a party violates the duty of disclosure. These two provisions now explicitly authorize exclusion of evidence as a sanction for a party's failure to make proper disclosure of expert testimony, if the judge affirmatively finds that a continuance is not an adequate remedy:

> Failure to provide timely disclosure under this rule shall entitle the [other party] to a continuance. If the court finds that a continuance is not an adequate remedy under the circumstances of the case, the court may impose other sanctions, including prohibiting [the party] from calling the expert at trial[.]

The supreme court's enactment of these amended provisions was, in effect, a modification or partial rescission of what this Court said in *Lewis* about the range of permissible sanctions for discovery violations. Our statements on this subject in *Lewis* were based on the language of Rule 16 as it existed in 1981. But the post–1995 version of Rule 16 now explicitly authorizes the exclusion of evidence as a potential sanction for this particular type of discovery violation—*i.e.*, a violation of the duty to disclose expert testimony.

Certainly, a defendant's constitutional right to present a defense is a weighty consideration militating against any sanction that precludes or restricts defense evidence. But we infer, from the supreme court's amendment of Criminal Rule 16 in 1995, that the supreme court viewed expert testimony as an area where willful discovery violations might more readily support a preclusion or restriction of defense evidence.

As the supreme court indicated in *Lee*, expert testimony is often complex, and its jargon and principles are often beyond the ken of non-experts. Thus, it is particularly difficult for an unprepared party to explain or rebut adverse expert testimony. We also note that, in this case, Judge Weeks declared that the preclusion or restriction of evidence as a means of deterring future discovery violations was important because the Juneau superior court had experienced repeated violations of the rules requiring disclosure of expert testimony by both prosecutors and defense attorneys. Judge Weeks's concern was implicitly grounded on the fact that the majority of criminal litigation is conducted by the same small group of attorneys (both prosecutors and defense attorneys) who work for, or under contract with, government agencies.

There are, of course, significant differences between the civil and criminal litigation processes. Further, our society's interest in fair and full adjudication is at its highest when someone's liberty is at stake. But the fact remains that our supreme court amended Criminal Rule 16 to expressly authorize preclusion of expert testimony as a sanction for failures to disclose this information. The supreme court's action is clearly premised on the idea that exclusion or restriction of evidence is sometimes justified, despite a defendant's constitutional right to present a defense.

 Thus, even though our supreme court's decisions in civil cases may not be controlling in all respects, these cases do provide certain rules that a trial judge in a criminal case should follow when deciding whether to preclude or restrict proposed expert testimony under Criminal Rules 16(b)(1)(B) and 16(c)(4).

First, a judge should not consider this sanction unless the judge finds that the fail-

ure to disclose was "willful"—in the sense that (1) there was a conscious decision not to disclose the information, and (2) this decision did not stem from a mistaken but good-faith objection to the discovery obligation, but rather from a "conscious intent to impede discovery".

 Second, even when the discovery violation is willful, a judge should not exclude or restrict the proposed expert testimony unless the judge affirmatively finds that lesser sanctions (such as a continuance) would not adequately remedy the situation. On the question of what remedies are "adequate", the judge must consider (1) the degree to which the non-disclosure will prejudice the non-offending party's ability to litigate the case, and (2) whether, given the history of the case, lesser sanctions will be sufficient to ensure future compliance with discovery obligations.

It is possible that, because of a defendant's constitutional right to present a defense, the weighing of these factors should be different when the offending party is the defendant (as opposed to the government). We need not decide this issue in Harris's case—because, given the facts of Harris's case, the superior court's action is clearly supportable.

As we have just explained, Criminal Rule 16(c)(4) authorizes the exclusion or restriction of evidence only when the judge finds that the defense violation of the duty of disclosure was "willful" (in the sense that it was prompted by a conscious intent to impede discovery), *and* only when the judge finds that lesser sanctions (such as a continuance) will not be adequate to (1) cure the prejudice to the other party and (2) ensure compliance with the discovery rules in the future.

Judge Weeks found that Hedland's violation was willful, and that finding is adequately supported by the record.

Judge Weeks also concluded that a further continuance of Harris's trial would not cure the prejudice to the State or ensure compliance with the discovery rules in the future.

With respect to whether lesser sanctions would be adequate to ensure future compliance with the discovery rules, Judge Weeks

noted that the defense attorney had already procured a lengthy delay of Harris's trial for the announced purpose of making sure that Dr. Ophoven would have a fair opportunity to study the medical records and formulate her report—and then the attorney willfully withheld the report. This behavior suggested that simply granting another continuance would not be sufficient to deter future violations.

With regard to whether a continuance would be an adequate remedy for the State, Judge Weeks noted that Harris's case was already more than a year old. The judge further noted the State had arranged for many other witnesses to come to Juneau to testify—witnesses who would have to be rescheduled (and who might potentially be lost) if Harris's trial were delayed.

Of course, one might argue that, absent the impending death or permanent unavailability of an important witness, a continuance—or, as was the case here, an additional continuance—will almost always be adequate to cure the prejudice to the non-offending party. But this is not how the Alaska Supreme Court has interpreted and applied this concept.

The supreme court's decisions in *Lee, DeNardo, Maines*, and *Honda Motor Co.* all indicate that the non-offending party has a cognizable interest in the scheduled trial date.

For instance, in *Lee*, the supreme court declared that the record supported the trial judge's decision to grant summary judgement against Lee because Lee's willful discovery violation had prejudiced the State:

> Lee's omissions delayed progress in the case and forced the state to either depose Lee without the aid of written discovery[,] or conduct a trial without the benefit of meaningful discovery.
>
> . . .
>
> [W]ithout pre-trial discovery, the state would have had inadequate time to examine and understand the scientific principles pertinent to [Lee's claims], and consequently might have been unable to dispute [their validity]. For these reasons, the sanction imposed [by the trial judge]—

accepting the [State's] alleged facts as admitted—was sufficiently tailored to the discovery violation.

141 P.3d at 350–51.

This quoted language makes sense only if one assumes that the State had an interest in having the case go forward as scheduled, and that the State would suffer a cognizable prejudice if the trial had to be delayed because of Lee's willful misconduct.

Likewise, in *DeNardo,* when the supreme court discussed why the non-offending party suffered prejudice as a result of DeNardo's discovery violations, the supreme court focused solely on the difficulties that the non-offending party would have encountered if they had been forced to trial without the information that DeNardo refused to disclose. 51 P.3d at 924–25. The supreme court did not discuss the possibility that, if a continuance had been granted, DeNardo might eventually have been coerced into making the required disclosures.

Similarly, in *Honda Motor Co.,* the supreme court upheld a trial judge's decision to enter judgement against Honda when the company repeatedly failed to make required pre-trial disclosures, even after the trial judge extended the disclosure deadlines. 751 P.2d at 493. Implicit in the supreme court's ruling is the concept that, in the face of a party's willful disobedience of disclosure obligations, it is sometimes permissible for a trial judge to insist on orderly procedure—and that a trial judge need not keep extending deadlines, or granting continuances of a trial—even when this means sacrificing the goal of a full litigation of the relevant facts.

(We also note, from the supreme court's recitation of the procedural history in *Honda Motor Co.,* that the supreme court did not require the trial judge to first try to compel compliance by imposing monetary sanctions on Honda or their attorneys before moving to the more severe sanction of issue-preclusion.)

Compare the supreme court's decision in *Maines,* where the court concluded that the trial judge was obliged to employ sanctions short of the preclusion of evidence because

"more than two months remained until the scheduled trial date", and thus "ample time remained to cure any problems [caused by the discovery violation]". 155 P.3d at 326.

Based on the Alaska Supreme Court's treatment of this issue, we reject Harris's contention that a continuance of trial will always be an adequate remedy unless the non-offending party proves that they will certainly lose evidence if the trial is delayed. The supreme court's decisions in this area show that the non-offending party has a protected interest in the scheduled trial date.

■ This interest is not absolute; it can be overridden when justice requires. But when a trial judge is confronted with willful disobedience to discovery rules and orders, the judge is not required to keep delaying the trial to protect the offending party's interest in a full hearing of the evidence. Rather, the judge has the discretion to order the trial to go forward with abridged evidence.

The ultimate question is whether, given the finding that Hedland's discovery violation was willful, Judge Weeks abused his discretion when he concluded that another continuance of Harris's trial would not cure the prejudice to the State or deter future violations of the discovery rules. Given the record before us, we can not say that Judge Weeks abused his discretion when he concluded that a continuance would not be adequate to achieve these purposes, and that a restriction on Dr. Ophoven's testimony was required.

*Harris's argument that, if Judge Weeks's ruling was proper under Alaska Criminal Rule 16(c)(4) as construed in light of the relevant case law, then Rule 16(c)(4) is unconstitutional*

■ Harris's final argument is that, if Judge Weeks's ruling is defensible under Criminal Rule 16(c)(4), then Rule 16(c)(4) is unconstitutional. Harris asks us to construe the Alaska Constitution as embodying the view taken by the dissenters in *Taylor v. Illinois.*[11] In other words, Harris asks us to hold that a defendant's constitutional right to

11. 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988).

present a defense absolutely bars trial judges from excluding potentially exculpatory evidence as a sanction for a defense violation of the discovery rules, no matter how egregious the violation, unless the defendant is personally responsible for the violation.

We reject Harris's argument for three reasons.

■ First, Alaska Criminal Rule 16(c)(4) expressly authorizes trial judges to exclude expert testimony as a sanction for a violation of the duty of disclosure imposed by that rule. Court rules, like statutes, are entitled to a presumption of constitutionality.[12]

■ Second, as this Court stated in *State v. Zerkel*, 900 P.2d 744, 758 n. 8 (Alaska App.1995), and again in *Aaron v. Ketchikan*, 927 P.2d 335, 336 (Alaska App.1996), "[w]hen a defendant asserts that the Alaska Constitution affords greater protection than the corresponding provision of the Federal Constitution, it is the defendant's burden to demonstrate something in the text, context, or history of the Alaska Constitution that justifies this divergent interpretation." Harris argues that we should reject the result in *Taylor v. Illinois* as a matter of Alaska constitutional law—in particular, under the compulsory process clause[13]—but he offers no pertinent discussion of the text, context, or history of that provision.

Third, the relevant decisions of the Alaska Supreme Court indicate that, although our state constitution may limit a judge's authority to enforce discovery rules by precluding or restricting evidence, our constitution does not absolutely bar judges from employing this sanction.

■ It is true that a defendant's right to present a defense is a fundamental tenet of our criminal justice system. But so, too, is the principle that a criminal trial should not be reduced to a process of evasion and ambush. For example, in *Babcock v. State*, 685 P.2d 721, 726 (Alaska App.1984), this Court recognized that a trial judge ultimately has the authority to bar a defense witness from testifying if the witness has willfully violated a sequestration order.

In Harris's case, Judge Weeks found that Harris's attorney purposely concealed the substance of Dr. Ophoven's proposed testimony with the intent of "sandbagg[ing]" the State. As our supreme court has noted, such "outright failures to respond to discovery [obligations] halt the case development process dead in its tracks, and threaten the underpinnings of the discovery system[.]" *Hikita v. Nichiro Gyogyo Kaisha, Ltd.*, 12 P.3d 1169, 1175 (Alaska 2000).[14]

In *DeNardo*, our supreme court held that, despite a civil defendant's constitutional right to due process and right to trial by jury, it was constitutional for the trial judge to grant judgement against DeNardo because of his willful discovery violations. 51 P.3d at 927–28. The supreme court declared, "A party willfully refusing to comply with a discovery order risks ultimate loss of its case, whether through dismissal (if the recalcitrant party is the plaintiff) or imposition of liability (if the non-complying party is the defendant)." *Id.* at 927.

It is true that DeNardo was representing himself, and he therefore bore direct responsibility for his failure to comply with the discovery rules. But the parties in *Lee* and in *Honda Motor Co.* were represented by counsel, and yet our supreme court did not mention this as a significant factor when the court upheld the litigation-affecting sanctions imposed by the trial judges in those two cases.

Harris does not discuss any of these cases, nor any others of more than tangential relevance. Because of this, Harris has failed to overcome the presumption that Criminal Rule 16(c)(4) is constitutional.

For all of these reasons, we uphold Judge Weeks's decision to limit the testimony of Dr. Ophoven.

*The evidence of Harris's prior conviction for assaulting another infant*

---

12. *DeNardo*, 51 P.3d at 928.

13. Article I, Section 11.

14. Quoting James William Moore *et al.*, *Moore's Federal Practice* (3rd ed.1997), § 37.90, Vol. 7, pp. 137–141.

In 1998, Harris assaulted his six-month old daughter in a manner similar to the way he assaulted the baby in this case: by breaking his daughter's upper right arm. He ultimately pleaded guilty to fourth-degree assault.

When the State took Harris's case to the grand jury, the State presented evidence of this prior conviction. Before trial, Harris sought a protective order barring the State from introducing this evidence at trial. Judge Weeks ultimately ruled that the evidence was admissible under Evidence Rule 404(b)(4) as construed in *Bingaman v. State*, 76 P.3d 398 (Alaska App.2003).

At Harris's trial, this evidence was presented to the jury by having the court take judicial notice of Harris's guilty plea to fourth-degree assault.

When the prosecutor delivered his summation to the jury, he pointed to Harris's prior conviction as tending to prove that Harris (among the three adults present when the baby's arm was broken) was probably the perpetrator. The prosecutor also pointed out that, because of this prior conviction, Harris had the most to lose if he was convicted of assaulting the baby. In addition, the prosecutor noted that Harris's sister, Linnea, had provided a false alibi for Harris in the 1998 case.

Alaska Evidence Rule 404(b)(4) states, in relevant part, that "[i]n a prosecution for a crime involving domestic violence, ... evidence of other crimes involving domestic violence by the defendant against the same or another person ... is admissible." In *Bingaman*, this Court clarified that Rule 404(b)(4) "authorizes a court to admit evidence of a defendant's other crimes involving domestic violence even though the only relevance of this evidence is to prove that the defendant characteristically engages in similar acts of domestic violence, thus making it more likely that the defendant committed the act of domestic violence alleged in the current litigation." [15]

On appeal, Harris argues that it was error for Judge Weeks to allow the State to introduce this evidence. Harris concedes that his prior conviction was probative to some degree. In fact, when this issue was litigated in the superior court, Harris conceded that "most of the factors [listed] in *Bingaman* ... [were] satisfied". However, Harris now argues that the State had so much other evidence connecting Harris to the present assault that there was little practical need to let the State introduce evidence of the prior assault.

This argument was not preserved for appeal. In the superior court, Harris argued that the *paucity* of the State's evidence linking him to the present crime, not its abundance, was the factor that made evidence of the earlier assault more prejudicial than probative.

Moreover, even if this argument had been preserved, it lacks merit. Harris relies on *Harvey v. State*, 604 P.2d 586 (Alaska 1979). In *Harvey*, the Alaska Supreme Court held that evidence of a defendant's past acts of abuse in child abuse cases is often relevant only in that "it reflects on the propensity of a past offender to continue a pattern of child abuse[, and t]his is precisely the type of inference Rule 404(b) is intended to prevent." [16] According to Harris, the decision in *Harvey* supports his contention that Judge Weeks should not have admitted evidence of Harris's prior assault conviction.

But the supreme court decided *Harvey* in 1979, before Evidence Rule 404(b)(4) was enacted. (That rule was enacted in 1997.[17]) As this Court explained in *Bingaman*, the legislature enacted Rule 404(b)(4) "to exempt certain evidence from Rule 404(b)(1)'s prohibition against propensity evidence." [18] In other words, the analysis used by the supreme court in *Harvey* is inconsistent with Alaska law following the enactment of Rule 404(b)(4).

Given the facts in this case, we conclude that Judge Weeks could reasonably find that

**15.** *Bingaman*, 76 P.3d at 401.

**16.** *Harvey*, 604 P.2d at 590.

**17.** *See* SLA 1997, ch. 63, § 22.

**18.** *Bingaman*, 76 P.3d at 408.

evidence of Harris's previous assault on his infant daughter was probative of Harris's identity as the baby's assailant in the present case, and that this evidence was not so unfairly prejudicial as to require exclusion under Evidence Rule 403. Moreover, Judge Weeks acted to minimize any potential prejudice by cautioning the jurors (1) that they were not to convict Harris for his past conduct, and (2) that Harris's prior conviction, by itself, was insufficient to prove his guilt in the present case.

We further note (although neither party has discussed this point) that the disputed evidence appears to have been independently admissible under Evidence Rule 404(b)(2)—the portion of Rule 404(b) that deals specifically with child abuse cases. This rule reads:

> In a prosecution for a crime involving ... physical ... assault or abuse of a minor, evidence of other acts by the defendant toward the same or another child is admissible if admission of the evidence is not precluded by another rule of evidence and if the prior offenses
>
> (i) occurred within the 10 years preceding the date of the offense charged;
>
> (ii) are similar to the offense charged; and
>
> (iii) were committed upon persons similar to the prosecuting witness.

Harris's prior assault on his infant daughter fits all three requirements listed in this rule.

### Conclusion

The judgement of the superior court is AFFIRMED.